FRANCIS S. HOYT et al.

*v.*

E. I. DU PONT DE NEMOURS POWDER COMPANY et al.

[Submitted July 28th, 1917.  Decided November 12th, 1917.]

1. The assets of a corporation cannot be used to retire capital stock as against the lien of bondholders, even though sufficient property remains to amply secure them.

2. A provision in a trust deed securing a corporation's bonds requiring a demand by twenty-five per cent. in value of the bondholders to move the trustee to action, restricts collection or foreclosure proceedings, but is not a limitation upon the inherent rights of bondholders to protect their interests.

On bill, &c.

Mr. *Edward M. Colie* and Mr.. *Runyon Colie,* for the complainants.

Mr. *Frank S. Katzenbach, Jr.,* and Mr. *J. P. Laffey* and Mr. *William H. Button* (of the New York bar), for the defendants.

BACKES, V. C.

This bill is to restrain the use of corporate assets to retire capital stock, in impairment of the rights of bondholders. Round figures and approximate sums will be used to explain the controversy. The defendant, the New Jersey-du Pont Company was a holding company until 1906, when it began manufacturing explosives and allied products. In that year it made a four and one-half per cent., thirty-year gold bond issue of $16,000,-000, secured by a trust deed, imposing

"a charge in favor of the trustee upon all its present and future property, including all its lands, plants, factories, machinery, goods, patent rights, trade-marks, processes, improvements, and all other property, both real and personal, of every name and nature whatsoever and wherever situated, and present and future net income, earnings and profits for the benefit of said bonds."

Since then and particularly during the present world-war, huge sums of money have been made out of military powder, and from a holding company of $37,500,000 of possessions, it had grown to a corporation of over $200,000,000 of assets, when in 1915, the management decided to reorganize. The Delaware-du Pont Company was formed with an authorized capital of $240,000,000, and bought the Jersey company's property and business for $120,000,000; the price being paid by $1,500,000 cash, $59,500,000 debenture shares, and $59,000,000 common stock of the Delaware company. The Jersey company used the cash to take up mortgage liens approximating that sum, and divided the $59,000,000 common stock among the holders of its $29,500,000 of common stock—a two hundred per cent. dividend. The $59,500,000 of debenture shares were calculated to

retire all of the Jersey company's liabilities, consisting of the
bond issue (then outstanding), $14,000,000; preferred stock,
$16,000,000; common stock, $29,500,000. All but $1,000,000
of the bonds, and $300,000 of the preferred stock, have been
retired, and there remains in the treasury $31,000,000 of the
debenture shares and cash. Halted in its scheme to dissolve,
the Jersey company now proposed to use $26,000,000 of the
debenture shares to retire that amount of the $29,500,000 of
its common stock, and proceedings, according to the statute,
are under way to decrease the common stock to $3,500,000. Ac-
complished, this would leave $5,000,000 of debenture shares
and cash to secure the unredeemed bonds and preferred stock.
The complainants, owners of $40,000 of the bonds, object, con-
tending that the debenture shares are, as after-acquired prop-
erty, subject to the lien of the bonded indebtedness and that the
intended use would be a dissipation of their security, to which
the Jersey company in substance replies that the security will
be equal to what it was when the bonds were issued, that it
is ample and that the complainants ought to be content—an
appeal to the complacent but not an answer to the issue tendered.

It is debatable whether the Jersey company had the right to
sell its assets in bulk and retire from business, in view of the
covenant contained in the trust deed that "it will at all times
do all things necessary to preserve its corporate existence and
will actively conduct and carry on the business for which it was
incorporated," notwithstanding the provisions of its charter and
a clause in the trust deed that "until default as hereinafter de-
fined, the Powder Company shall at all times have control of all
of its property, and the right to use, sell or otherwise deal with
and in the same as it may see fit, and may dispose of all profits
and income thereof, including income of the securities held by
the Trustee in the shape of dividends or otherwise." This
question, however, is not raised and under the frame of the
bill the exchange by the Jersey company of one class of prop-
erty for the other is affirmed and the substitution of securities
assented to. It is also not in dispute that upon the conversion,
the lien of the trust deed upon the newly-acquired property
was subject to the right reserved to declare dividends, and the

distribution of all the surplus, by the two hundred per cent. dividend to the common stockholders, is not challenged. Nor is the use of the securities, to redeem *pro tanto* the bond issue, seriously criticised, as it well might be, but what the complainants protest against is the further abstraction of securities from the fund created and pledged to secure their debt, and their absorption by stockholders, in liquidation of a subordinate liability—an effort which finds no support in principle or authority and so inherently wrong as to require only a recital to manifest its illegality. *Ikelheimer* v. *Cons. Tobacco Co., 59 Atl. Rep. 363; Fidelity Trust Co.* v. *Hoboken and Manhattan R. R. Co., 71 N. J. Eq. 14; Watt* v. *The Hestonville, M. & F. P. R. R. Co., 1 Brew. (Pa.) 418.*

Acknowledging that the scheme to reach $26,000,000 of $29,-500,000 of assets, by converting it into surplus through a reduction of the par value of the Jersey company's three hundred and fifty thousand shares of common stock from $100 to $10, thus decreasing its authorized capital from $35,000,000 to $3,-500,000, ignores the bondholders' lien upon the entire assets, the defendant argues with much earnestness that inasmuch as the ratio of assets to bonds at the time they were issued was two and a half to one, and that the remnants under the proposed plan will leave the ratio of $5 of security to every dollar of bond, plus the lien of the trust deed upon the property transferred, the complainants will suffer no injury and have no cause for complaint. This falsely assumes the power to convert capital into surplus for stock dividend purposes and the right of the debtor to dictate what of his securities the creditor may retain and what of them may be confiscated. Even if the Jersey company's assurance that the bonds will be paid at maturity, and the interest in the meantime, and that the security is adequate, even gilt-edge, be accepted as facts, it is still clear that the bondholders may be injuriously imposed upon and their property impaired. Industrial securities, unlike investment in ordinary bond and mortgage on land, have a legitimate speculative value depending on the success or failure of the enterprise and reflected by daily quotations on the exchange. No better

illustration can be had than the rise in market value from $85 to $102, of these very bonds, the moment the reorganization was announced and it became known that back of the bonds were two hundred millions instead of thirty-seven and a half millions. And that such an event was probable and contemplated by the New Jersey company is evinced by the stipulation in the trust deed that at any time before maturity the bonds were redeemable at $110. Of this prospect, obviously the bondholders cannot be deprived. But, aside from the speculative feature, it is the province of the bondholders to retain all that has been pledged to secure their debt and until they are paid the debtor has no choice. Who can tell what the Delaware company's debenture shares will be worth henceforth and until maturity in 1936? Surely the complainant-bondholders are not obliged to take the risk.

The provision in the trust deed requiring a demand by twenty-five per cent. in value of the bondholders to move the trustee to action, restricts collection or foreclosure proceedings, but is not a limitation upon the inherent rights of bondholders to protect their interests. *Chicago, &c., Railroad Co.* v. *Fosdick, 106 U. S. 47; Carter* v. *Fortney, 170 Fed. Rep. 463; The Guaranty Trust Co.* v. *Green Cove Railroad, 139 U. S. 137; Mack* v. *American, &c., Co., 79 N. J. Law 109; Schultz* v. *Van Doren, 64 N. J. Eq. 465; affirmed, 65 N. J. Eq. 764; Reinhardt* v. *Interstate Telephone Co., 71 N. J. Eq. 70.*

An injunction will issue restraining the distribution of the assets to the stockholders. With the proposed reduction of capital stock, the secondary purpose of which is to reduce corporation taxes, the complainants have no concern, and the *ad interim* restraint in this respect will be dissolved. The complainants are entitled to costs.