141 F.2d 734 (1944)
In re COMMONWEALTH LIGHT & POWER CO. et al.
BACHRACH
v.
CENTRAL HANOVER BANK & TRUST CO.
No. 8126.
Circuit Court of Appeals, Seventh Circuit.
February 25, 1944.
Rehearing Denied April 6, 1944.
*735 Robert Bachrach and Moses, Kennedy, Stein & Bachrach, all of Chicago, Ill., for trustee.
Robert N. Golding, of Chicago, Ill., for Middle West Corporation.
Perry M. Chadwick, of Chicago, Ill., for Guaranty Trust Co. of New York.
James G. Culbertson and Joseph H. Hinshaw, both of Chicago, Ill. (Oswell G. Treadway, of Chicago, Ill., of counsel), for Arthur E. Swanson, Kellogg Logsdon, and Gary Barthell.
Thomas B. Hart, John I. Mayer, and Edward P. McGuire, all of Chicago, Ill., John F. Davis, Sol., and Homer Kripke, Asst. Sol., both of Philadelphia, Pa., and Morton E. Yohalem, Special Counsel, Public Utilities Division, of New York City, Theodore L. Thau, of Philadelphia, Pa., for appellee Securities and Exchange Commission.
Irwin T. Gilruth and Gilruth & Beck, all of Chicago, Ill., and Frank H. Heiss and Rathbone, Perry, Kelley & Drye, all of New York City (A. M. Lewis and Frederick W. Doolittle, Jr., both of New York City, of counsel), for appellee Central Hanover Bank & Trust Co.
Before SPARKS, KERNER, and MINTON, Circuit Judges.
KERNER, Circuit Judge.
We have here an appeal from an order of the District Court in the reorganization of Inland Power & Light[1] Corporation, regarding the allocation of $1,045,134.24  the proceeds of the sale of the common stock of Michigan Public Service Company  to the bonds issued by Inland of which Central Hanover Bank and Trust Company is indenture trustee and pledgee.
Appellant, Guaranty, as trustee under a certain trust agreement made by Inland and covering Inland's unsecured debentures, and the unsecured creditors, Middle West and Bachrach, as trustee of Commonwealth, and appellees, the bondholders, secured creditors of Inland, and the S.E.C. are in a bankruptcy court, asserting claims against Inland to a fund representing the proceeds of assets of Inland's estate.
At the time of these proceedings all of the common stock of Michigan was owned by Inland, all of the common stock of Inland was owned by Commonwealth, and all of the common stock of Commonwealth was owned by Middle West and one of its subsidiaries. Middle West holds claims against Inland consisting of $288,100 of Inland's unsecured debentures and $1,160,600 of Inland's bonds. Commonwealth holds an unsecured claim against Inland for $3,449,647 and Middle West holds 85% of all of Commonwealth's indebtedness.
In 1934, proceedings for the reorganization of Commonwealth, the parent, and Inland, the subsidiary, were instituted under § 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, to supersede prior equity receiverships of the two companies. These proceedings were, by order of the court, consolidated.
Inland, on April 1, 1927, owned all of the common stock of Michigan. This stock, Inland pledged with Central to secure Inland Bonds in the par amount of $4,782,500. In addition, Inland, on September 27, 1940, owned, as part of its unpledged assets, demand notes of Michigan in the principal amount of $620,132.24. September 12, 1940, the trustee of Inland filed a petition or application for leave to sell the common stock of Michigan and to sell or cancel the Michigan demand notes. September 27, 1940, the District Court directed Inland's trustee to surrender to Michigan, for cancellation, the demand notes, and ordered that the Michigan stock be sold for $1,045,134.24, and reserved for future disposition all questions relating to the allocation of the proceeds of the sale between the stock and the demand notes.
On November 20, 1940, upon the petition of the trustee of Commonwealth, the court entered a rule to show cause why the demand notes should not be first paid out of *736 the fund of $1,045,134.24. Answers were filed thereto by Central, as trustee of the Inland bond indenture under which the stock had been pledged, and by a committee for Inland Bonds, and by the S.E.C., asserting that the entire proceeds of sale should be allocated to the Michigan common stock.
The issues thus raised were referred to a master. He heard the evidence and filed his report in which he found facts from which he concluded that Inland, having pledged the Michigan stock as security for its bonds and having sold such bonds on the strength of such security, owed a fiduciary duty to its bondholders as pledgees not to exercise its control of Michigan to serve its own interest at the expense of the bondholders as such pledgees; that Inland had failed to observe the standard of conduct imposed by that relationship, and had, instead, organized, managed, and controlled Michigan as best served its own interest; that such control and management resulted in a dilution of the value of the Michigan stock and a consequent injury to Inland bondholders as pledgees thereof; and that because of the breach of its fiduciary duty, its claim must be subordinated to the claims of the bondholders. The District Court adopted the master's findings of fact, overruled exceptions and objections to the report, and entered a decree that the $1,045,134.24 be subjected to the lien of the indenture securing the Inland Bonds and that the claim of Inland be subordinated to the claims of the holders of Inland Bonds. From that decree, this appeal is prosecuted.
Appellant Guaranty makes the point that the District Court was without jurisdiction to pass upon the claim of Inland based on the demand notes. It admits that the court had jurisdiction to pass upon the claims of Inland's creditors against the assets of Inland, to allow or disallow them or to subordinate one to another, but it argues that since the court was not administering the assets of Michigan, it had no jurisdiction to adjudicate a claim by Inland on the notes.
A bankruptcy court is essentially a court of equity, applying principles and rules of equity jurisprudence. It is empowered to allow or disallow claims and to determine controversies in relation thereto, and has full power to inquire into the validity of any claim asserted against the estate and to sift the circumstances surrounding any claim, to see that injustice or unfairness is not done in the administration of the bankrupt estate. Pepper v. Litton, 308 U.S. 295, 304-308, 60 S.Ct. 238, 84 L.Ed. 281. The demand notes were a part of the Inland estate, which estate was being reorganized in a court of equity possessing ample powers for the exigencies of varying situations. American United, etc., v. City of Avon Park, 311 U.S. 138, 146, 61 S.Ct. 157, 85 L.Ed. 91, 136 A.L.R. 860. But Michigan was not a necessary party to the reorganization, Equitable Trust Co. v. Denney, 7 Cir., 24 F.2d 169, and the fact that Michigan was not in bankruptcy did not preclude the parties who were before the court from claiming property which was within the jurisdiction and custody of the court. The Inland bondholders were parties to the reorganization proceedings and were entitled to participate in the reorganization in order to obtain the full value of their security. The debenture-holders were also parties to the proceedings, asserting their claim to Inland's assets. With these parties before it, the court considered the respective equities of the claimants in the proceeds of the sale of the Inland estate and determined that the equities were with the bondholders. Under this state of the record we see no lack of jurisdiction.
On the facts found by the master, most of which came into the record by stipulation and are not in dispute, all of the appellants contend that under the facts the doctrine of equitable subordination, upon which the District Court based its decision, is not applicable.
On the other hand, appellees, in support of the order, contend that Inland mismanaged Michigan through its dividend and depreciation policies and by its failure to make provision for sound financing of Michigan's expansion program and by creating an enormous debt and issuing preferred stock ahead of the pledged stock, committed a breach of its fiduciary duty to its pledgees, and, since the entire proceeds of the sale are necessary to make Inland bondholders whole, the notes, because of the superior equities of the bondholders, must be subordinated to the common stock of Michigan.
It is true that Inland, by reason of its entire ownership and control of Michigan, occupied a fiduciary position requiring scrupulous observance of its obligations to safeguard and preserve the interest of Inland Bonds, and owed to its bondholders, a *737 duty not to impair the value of the Michigan stock.[2] And where there is a violation of those principles, equity will undo the wrong. Pepper v. Litton, 308 U.S. 295, 311, 60 S.Ct. 238, 84 L.Ed. 281.
This brings us to the questions of law and fact which the District Court decided in entering the order challenged.
As already indicated, the master found that Inland, having pledged Michigan stock as security for its bonds which were sold on the strength of such security, owed a fiduciary duty to its bondholders as pledgees, not to exercise its control of Michigan to serve its own interest at the expense of the bondholders as such pledgees; and that Inland so managed and controlled Michigan as best served its own interest, resulting in a dilution of the value of the Michigan stock to the injury of the bondholders as pledgees.
In view of the contentions made, it is clear that the decisive questions are (1) did Inland so exercise its control of Michigan as to impair the security of the Inland Bonds in violation of its fiduciary duty to its bondholders; and (2) whether the court erred in subordinating Inland's claim on the notes to the bondholders' claim on the Michigan stock with respect to the fund derived from the cancellation of the notes and the sale of the stock. There are, however, other issues which will be discussed in the opinion.
The record discloses that Inland and Michigan were part of what was commonly known as the Commonwealth System; that Commonwealth was organized in 1916 for the purpose of operating utility properties; that by 1925 it had acquired control of numerous operating companies with properties in various states; that in 1921 it acquired the stock of Interstate Electric Company, a holding company which likewise owned the stock of operating companies located in the same territory as the Commonwealth System; and that in 1926 the Commonwealth System was reorganized under a plan which provided for the organization of Inland, pursuant to which Inland acquired all of the investments of Commonwealth and Interstate in their operating subsidiaries. In January 1926, Inland was organized and the interests of Commonwealth and Interstate and their operating companies were conveyed to it, and these companies were then consolidated into Michigan which was organized on May 31, 1927, and Inland acquired all of the common stock of Michigan.
On April 1, 1927, all of the common stock of Michigan was pledged under an indenture to Central to secure Inland Bonds, the indenture providing that Inland was to retain the right to vote the stock and to receive all dividends paid except after default or upon liquidation.
In May, 1927, the actual investment in the properties of Inland's operating subsidiaries located in the State of Michigan was $2,203,845. These companies had bonds, mortgages and bank loans outstanding of $1,528,000 and owed Inland $446,951 on open account, but upon consolidation with Michigan, the assets acquired, after deducting a retirement reserve of $404,169, were recorded on Michigan's books at $4,170,354. Included in this property account were direct and indirect write-ups amounting to $1,966,509. On the organization of Michigan, $2,000,000 of new bonds were issued and sold to Inland for $1,840,000 and accrued interest of $15,556. With the proceeds Inland retired the debts of Michigan's predecessors at a net cost of $1,602,048, and reimbursed itself for net expenditures of $172,471 made on behalf of Michigan and reduced the open account to $365,914, which was then refunded into a note bearing interest at 7%. Michigan thus started life with $2,000,000 of bonds and $365,914 of note indebtedness, to balance properties which represented an investment of $2,203,845. The properties, however, were on the basis of an appraisal, written up on Michigan's books to $4,574,523. The record, however, contains no evidence justifying the write-ups.
It further appears that after Inland and its subsidiaries had commenced operations, Inland issued $5,161,900 of bonds, part of which was used to meet the financial obligations *738 of Commonwealth and its affiliated company Interstate. The balance was sold to the public.[3] The bonds were secured by a pledge of the common stocks of Inland's five operating public utility companies, of which Michigan was one. The prospectus represented that the subsidiaries collectively had about $15,000,000 of debt and preferred stock ahead of the pledged common stocks; that the aggregate annual gross earnings of the system were $4,083,811, of which $3,375,490 was required by senior charges and $708,321 was available for the Inland Bonds; and that the pledged stocks as a group had an equity of over $1,600 for each $1,000 bond. This amount included the value ascribed to the Michigan stock by a balance sheet of Michigan prepared by Michigan's auditors as of the time of organization, showing a common stock equity of $1,250,000 in stated value and $1,019,822 in acquired surplus.
From January 2, 1928 to November 30, 1932, Michigan issued demand notes to Inland to cover cash advances, dividends, interest on open account, and other items in the sum of $2,712,212, and during this period, Michigan reduced its notes payable by cash payments of $283,268 and by $1,345, 432 by the issuance of $1,508,000 principal amount of bonds and by the issuance of common stock to Inland, for which Michigan received a credit of $463,380, leaving a balance of $620,132 unpaid at the time Inland was placed in receivership.
Michigan's construction, equipment, and plant purchases from 1927 to 1932 amounted to more than $4,000,000 and was financed by the issuing of senior securities, and during this period, Michigan borrowed $1,150,000 in bank loans, $2,346,198 in notes payable to Inland and $31,293 on open account advances from Inland, all of this being over and above the initial debt of $2,000,000 in bonds and $365,914 of notes payable to Inland. The bank loans were repaid with funds borrowed from Inland, while Inland was in turn paid with money obtained from the sale of $2,173,000 of Michigan bonds and $869,200 par value of preferred stock. Pressure was created on Inland. It came on Inland from its own bonds, $1,002,600 of which were held by Middle West, from its preferred stock of $1,587,000 par value, which contained a provision that upon default in payment of dividends, voting control would pass to the preferred, and from an open account to Commonwealth, which was itself indebted to Middle West, and presented a heavy drain on Michigan's income in the form of interest, sinking fund, and dividend requirements. At the same time, Commonwealth, having its own security structure, had to draw income from Inland to as great extent as possible so as to make payments on its common stock and on an open account held by Middle West to satisfy the demands of Middle West's own capital structure. To meet the situation, Inland caused most of the intercompany debt to be funded in bonds and preferred stock of Michigan, which it then took and sold to the public, thereby realizing cash for its own needs and those of is parents. Also, Michigan, not at its own volition, but upon the demand and under the domination of Inland, was required to declare and pay in dividends approximately 80% of its income, at a time when Michigan was engaged on an extensive rehabilitation and expansion program which it was unable to finance out of its own income. Out of the total of $548,697 paid as dividends, $161,500 was paid by notes of Michigan to Inland and $326,972 was paid by open account borrowings from Inland, made a few days before or after the payment of dividends, and the open account advances thus created were included in the debt subsequently funded by notes, bonds, or preferred stock of Michigan.
It also appears from this record that during the period in question, the ratio of retirement expense to the property account of Michigan was 0.4% in each of two years, 0.5% in each of two years, and 0.8% in the remaining year. During this period Michigan actually retired property of a book value of $648,287.62, while a total of only $201,836.40 was credited to the retirement reserve.
We think the principal question raised by this appeal has in substance been decided by the Supreme Court in the case of Taylor v. Standard Gas & Electric Co., 306 U. *739 S. 307, 618, 59 S.Ct. 543, 83 L.Ed. 669, frequently referred to as the Deep Rock case.
Appellants Middle West, Commonwealth, and Inland, however, contend that the instant case is not like the Deep Rock case and they argue that that case did not involve a pledge relationship; and that the decision rested upon the operation of Deep Rock as an instrumentality, coupled with mismanagement, showing fraud and spoliation.
With this contention we are unable to agree, since we believe that the Deep Rock case, with the exception that it does not involve a pledge relationship, is in many respects factually parallel with ours. It involved the fiduciary relationship between a corporation having a controlling interest in a subsidiary corporation and the security-holders of the subsidiary. In that case the parent corporation, Standard Gas & Electric Company, dominated and controlled its subsidiary, Deep Rock Oil Company, by means of ownership of all the common stock of Deep Rock, which had been organized with an inadequate capitalization wholly insufficient for its business, and it had a large bonded debt. In addition, Standard caused Deep Rock to sell from time to time preferred stock to the public and to build up a large open account indebtedness from Deep Rock to Standard, arising principally out of cash advances, interest on open account and dividends declared by Deep Rock on its common stock. The dividends were declared at a time when Deep Rock did not have the cash available to pay them and when Deep Rock was in fact borrowing large sums from or through Standard. Eventually, both corporations went into reorganization under the Bankruptcy Act. Standard, in the Deep Rock proceedings, asserted a claim as an unsecured creditor, which was included in a proposed plan of reorganization. Deep Rock's preferred stockholders objected. The court held the plan should not be approved because of Standard's wrongful and injurious conduct in the mismanagement of Deep Rock's affairs and that equity required that a superior position be awarded to Deep Rock's preferred stockholders in the reorganized company.
From the evidence it clearly appears that Michigan was under the complete control and domination of Inland; that it was insufficiently capitalized; that Inland failed to make provision for sound financing for Michigan's extensive rehabilitation and expansion program; and that Michigan, upon the demand of Inland, declared dividends which were paid to Inland by open account borrowings from Inland. The elements just enumerated were present in the Deep Rock case, and in disposing of the question there involved the court said: "It is impossible to recast Deep Rock's history and experience so as even to approximate what would be its financial condition at this day had it been adequately capitalized and independently managed and had its fiscal affairs been conducted with an eye single to its own interests." 306 U.S. at page 323, 59 S.Ct. at page 550, 83 L.Ed. 669. In other words, the establishment of a definite amount of damages, in the strict sense of the term, is not a prerequisite to the application of the equitable remedy of subordination. So, too, in our case, it is impossible to compute the damage to the Inland bondholders caused by these factors. Applying the rule enunciated in the Deep Rock case to the facts in the instant case, we are impelled to the conclusion that the District Court did not err in holding that Inland controlled Michigan as best served its own interests and as a result, the value of the Michigan stock was impaired to the injury of the Inland bondholders as pledgees thereof.
The chief insistence of appellant Guaranty is, that the District Court erred in subordinating Inland's claim on the demand notes to the bondholders' claim on the stock securing their bonds.
The argument is that the doctrine of equitable subordination does not apply to a controversy between different groups of the parents' creditors. The doctrine, it is said, is limited to claims asserted by the parent against public security-holders of its subsidiary. It argues further, that since the Inland debenture holders never managed or controlled either Inland or Michigan, they owed no fiduciary duty to Inland Bonds or to the stockholders of Michigan, nor could they have breached such duty through mismanagement.
In elaborating this contention, Guaranty argues that to extend the doctrine to a case involving the competing claims of public security-holders of the subsidiary, would visit the sins of the parent upon its innocent public security-holders. It insists that the doctrine cannot have any application to the debenture-holders; that the *740 doctrine can only be invoked as a means of subordinating claims which might be asserted by Commonwealth, the parent of Inland, or by Middle West, the parent of Inland, or by Middle West, the parent of Commonwealth, and it concludes its argument by stating that under the general principles of bankruptcy administration, equality between creditors must prevail.
In support of its argument the cases of Consolidated Rock Products Company v. DuBois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982, and Prudence Realization Corp. v. Geist, 316 U.S. 89, 62 S.Ct. 978, 86 L.Ed. 1293, are cited.
As we understand the argument, this appellant cites the Consolidated case in support of its contention solely because the court made the following cautionary comment: "We are not dealing here with a situation where other creditors of a parent company are competing with creditors of its subsidiaries." 312 U.S. at page 524, 61 S.Ct. at page 684, 85 L.Ed. 982. In the Prudence case it is claimed the court made a holding that gives support to the view that the doctrine of subordinating a claim of a parent corporation to that of the public security-holders of its subsidiary does not extend to the case of an insolvent parent.
Our analysis of the Prudence case has convinced us that it does not support Guaranty's contention. In that case there was no contention that the insolvent parent had been guilty of any wrongdoing or other inequitable conduct which would warrant application of the subordination remedy and no attempt was made to prove any inequity arising from the circumstances of the acquisition or reacquisition of the guaranteed securities. The only basis for subordination of the insolvent parent's claim against the assets of the insolvent subsidiary was that as guarantor of the subsidiary's obligations, it could not compete with the creditors of the subsidiary to whom it had extended the guaranty. Nor do we think that the court in the Consolidated Rock Products case held that the insolvency of a parent corporation was a bar to subordination. That case involved a reorganization of a solvent parent and its two subsidiaries. The operation of the subsidiaries by the parent had resulted in extensive commingling of the assets. The parent had no funded debt, and its creditors other than the subsidiaries were either to be paid in full or their obligations were to be assumed by the reorganized company. Upon the theory that the parent had appropriated and commingled their assets and that the subsidiaries had been operated as mere departments of the parent's business, the Supreme Court held that the bondholders of the subsidiaries could reach the assets of the parent.
Only one other contention need be considered. It is contended that a settlement agreement dated August 12, 1936, between Middle West, Inland's trustee and the trustee of Commonwealth, settling a controversy regarding certain securities, including the Michigan demand notes, which had theretofore been transferred by Inland to Commonwealth against a credit on the indebtedness of Inland to Commonwealth, and pledged by Commonwealth with Middle West's predecessor, estops Inland bondholders from urging the subordination of the demand notes.
The record discloses that during the years 1928-1930, the North American and Middle West Utilities interests furnished Commonwealth with $4,500,000 by purchases of common stock from Commonwealth, and that Commonwealth advanced a large portion of this money to Inland for which it took Inland's note. With this money Inland purchased securities and made advances to its own subsidiaries. After all these transactions, Inland owed Commonwealth $4,893,373.13. In June, 1932, instead of paying Commonwealth what it owed, Inland transferred to Commonwealth the securities which it had purchased and the notes (including the Michigan demand notes) which it had received from subsidiaries for such advances, receiving a credit of $3,387,315.14 therefor, on its obligations to Commonwealth. Thereafter, Commonwealth pledged these securities with the receivers of Middle West to secure its indebtedness to them. After Inland went into bankruptcy, its trustee filed a petition in which he sought to reverse the transaction on the ground it was fraudulent. To this petition Central filed an answer praying that if there were "serious and bona fide conflicting claims to property and liabilities * * * then the said conflicting claims should be compromised." A settlement was entered into and approved by the court on June 7, 1937. The order approving the settlement found that the Inland trustee was the legal and equitable owner of the demand notes, and directed that Inland should recover the *741 notes from Middle West and Commonwealth "free and clear of any and all claims."
To us it is clear that the controversies compromised related to the return of the notes and did no more than settle the property rights thereto. The settlement was unrelated to the Inland bondholders' equitable claim against Inland, and there was no question raised as to the validity or enforcibility of the notes or their place in Michigan's capital structure. Under such circumstances, the Inland bondholders were not estopped.
The order of the District Court is affirmed.
NOTES
[1] Hereinafter the parties will be referred to as follows: Inland Power & Light as "Inland." Michigan Public Service Company as "Michigan." Central Hanover Bank and Trust Company as "Central." Commonwealth Light & Power Company as "Commonwealth." The Middle West Corporation as "Middle West." Guaranty Trust Company of New York as "Guaranty." Collateral Trust Gold Bonds of Inland as "Inland Bonds." Securities and Exchange Commission as "S.E.C." Interstate Electric Company as "Interstate."
[2] Ritchie v. McMullen, 6 Cir., 79 F. 522; Hoyt v. E. I. Du Pont de Nemours Powder Co., 88 N.J.Eq. 196, 102 A. 666; Gorman-Wright Co. v. Wright, 4 Cir., 134 F. 363; Cream City, etc., v. Coggeshall, 142 Wis. 651, 126 N.W. 44, 135 Am.St.Rep. 1091; McCaleb v. Goodwin, 114 Ala. 615, 21 So. 967; Kono v. Roeth, 237 App.Div. 252, 260 N.Y.S. 662; In re Norcor Mfg. Co., 7 Cir., 109 F.2d 407; Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 618, 59 S.Ct. 543, 83 L.Ed. 669; Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L. Ed. 281; Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 520, 61 S.Ct. 675, 85 L.Ed. 982.
[3] Of these bonds, $2,161,900 were exchanged on a par for par basis for bonds of Interstate and Commonwealth, and $3,000,000 were sold to the public. Other securities issued in the organization of Inland were $1,291,900 of 7% Sinking Fund Debentures (in exchange for debentures of Interstate), $1,286,450 of $100 par value preferred stock (sold to the public), and 200,000 shares of no par value common (all owned by Commonwealth and pledged to secure its bonds).