No. 36,108

THE MILLERS NATIONAL INSURANCE COMPANY, THE MICHIGAN MILLERS MUTUAL FIRE INSURANCE COMPANY, THE MILLERS MUTUAL FIRE INSURANCE ASSOCIATION, OF ILLINOIS, and THE WESTERN MILLERS MUTUAL FIRE INSURANCE COMPANY, *Appellees,* v. F. L. BUNDS, *Defendant,* United States of America, Intervenor, *Appellant.*

No. 36,113

THE MILLERS NATIONAL INSURANCE COMPANY et al., *Appellees,* v. F. L. BUNDS, *Defendant,* GUS ST. LOUIS, as Executor of the Last Will and Testament of Caroline Mohr, Deceased, Intervenor, *Appellant.*

(149 P. 2d 350)

Opinion filed June 10, 1944.

*Alex Hotchkiss,* of Lyndon, argued the cause, and *George E. Ramskill, Veva Ramskill,* both of Burlingame, *Robert Stone, James A. McClure, Robert L. Webb, Beryl R. Johnson* and *Ralph W. Oman,* all of Topeka, were on the briefs for appellant Gus St. Louis; *Lester Luther,* assistant U. S. attorney, argued the cause, and *George H. West,* U. S. attorney, was on the briefs for appellant United States of America.

*Howard Jones,* of Topeka, and *Alvin C. Trippe,* of Kansas City, Mo., argued the cause, and *John E. Addington,* of Topeka, was on the briefs for the appellees.

The opinion of the court was delivered by

Hoch, J.: This appeal presents, primarily, this question: May the owner of grain stored in a public warehouse (G. S. 1935, ch. 34, art. 2) whose grain has been destroyed by fire recover on a fire insurance policy issued to the warehouseman under section 34-236, G. S. 1935, although the fire had been caused, without connivance or knowledge of the owner, by the felonious act of the warehouseman?

Brief statement of the facts will suffice. F. L. Bunds was licensee and operator of a local public warehouse at Scranton, Kan. As such licensee he obtained a policy from the Millers National Insurance Company to cover loss by fire and other hazards both to his own property and to the grain of others stored in the warehouse. The warehouse was destroyed or partially destroyed by fire and Bunds filed a claim, under the policy, for $9,715.92, covering among other losses that of the grain stored in the warehouse, and for which warehouse receipts had been issued. Pending action upon the claim Bunds admitted that he set fire to the elevator for the purpose of collecting the insurance, was prosecuted, pleaded guilty, was convicted, and given a prison sentence. Some time thereafter the insurance company, appellee here, filed its petition for a declaratory judgment, naming Bunds as defendant. After reciting the facts hereinbefore stated, it averred that an actual controversy existed between it and the defendant as to liability under the policy; that uncertainty existed owing to the fact that the defendant might bring action upon the policy at any time within five years and that on account of the delay its rights might be prejudiced by the disappearance of material witnesses or otherwise. Other averments made for the purpose of establishing a right to maintain the action for a declaratory judgment need not be recited. No question has been raised as to whether the case was a proper one for invoking the declaratory judgment statute and we will not discuss that question.

In its petition the insurance company asked that the policy be declared null and void. Separate motions were filed by the United States of America and Gus St. Louis as executor of the estate of Caroline Mohr, deceased, asking leave to intervene, as defendants. The motions were allowed and answers and cross-petitions substantially alike were filed. The averments covering matters not in issue need not be recited. The United States claimed as holder of warehouse receipts taken by the Commodity Credit Corporation, a fed-

eral agency, the grain so represented being valued at $8,461.74. St. Louis, executor, asserted ownership by the Mohr estate of grain valued at $1,313, represented by warehouse receipts. In the answers St. Louis admitted that Bunds unlawfully caused the fire, and the United States stated that it neither admitted nor denied it. Both answers denied any responsibility for Bunds' unlawful act. Both cross petitions asked recovery on the ground that by virtue of the policy and the statute under which it was issued there was a valid contract between them and the plaintiff, and that they could not be held liable for the unlawful act of Bunds. Further recital of the allegations in support of a cause of action based upon that theory is unnecessary. Upon motion of the plaintiff the trial court struck out all parts of the cross petitions in which the intervenors asserted their right to recover under the policy in spite of the unlawful act of Bunds. From that order this appeal was taken.

The question may be divided into two parts: First, were appellants, as owners of the stored grain, entitled under any circumstances to bring action on the policy; second, if so entitled, is recovery barred by the act of Bunds which voided the policy as to him.

We have no difficulty with the first question. Our code of civil procedure provides:

"Every action must be prosecuted in the name of the real party in interest, except as otherwise provided in section 27." (G. S. 1935, 60-401.)

Section 60-403 provides, in part, that "a person with whom or in whose name a contract is made for the benefit of another . . . may bring an action without joining with him the person for whose benefit it is prosecuted." Appellee concedes that if Bunds had collected the insurance he would have held the proceeds for the benefit of the appellants and other owners of the stored grain. Clearly the insurance contract, as far as the wheat involved is concerned, was for the benefit of appellants. Under section 60-403 Bunds might have maintained the action although they were the real parties in interest. But section 60-403 is permissive and not mandatory. (47 C. J. 38; *Wilson Company v. Hartford Fire Insurance Co.*, 300 Mo. 1, 39, 254 S. W. 266.) Certainly the owner of stored grain, covered by insurance, is the real party in interest under the policy. As such he is entitled, as well as the person to whom the policy is directly issued, to bring action. (Annotation 61 A. L. R. 720; 26 C. J. 484.)

The second question is not free from difficulty. In an action on

the policy by the owners of stored grain does the insurance carrier have available all defenses it would have had in an action by the warehouseman? Otherwise stated, do the owners, as plaintiffs, simply step into the shoes of the warehouseman?

At the outset it may be said that cited cases and others dealing with contracts between private persons relating to matters not affected with a public interest have little, if any, bearing upon the issue here. It may be conceded that as to such matters the general rule is that in an action by a third person in whose interest or for whose benefit a contract has been made, such person has no greater rights than those by whom the contract in his interest was made, unless subsequent to the execution of the contract and in reliance upon it, he has been led to alter his position to his disadvantage if the contract is voided. But we are not here dealing with a contract unrelated to the public interest. We are dealing with a policy issued under specific statutory requirement. Accordingly the issue must be approached in the light of the terms and the intent of the statute.

It requires no citation of authority to support the proposition that warehouses maintained for the storage of goods and merchandise offered for such purpose are proper subjects for state regulation, as being affected with a public interest. Early in the history of this state the storage of grain in public elevators or warehouses became the subject of regulatory legislation. The history of such legislation is sketched in considerable detail in *Kipp v. Goffe & Carkener*, 144 Kan. 95, 101, 102, 58 P. 2d 102, and need not be repeated here. The present statute, chapter 194 of the Laws of 1931 (G. S. 1935, 34-223 to 34-2,103), is entitled "An Act to provide for storage of grain in state licensed warehouses and under state supervision and issuance of warehouse receipts therefor, and providing penalties for offenses thereunder, and repealing," etc. Some provisions of the act, here pertinent, may be summarized as follows:

Public warehouse defined as an elevator or other building adjacent to a railroad in which grain is received for storage or transfer for the public;

State license required before transacting such business;

State inspection required before issuance of license to determine whether building is suitable for storage of grain;

Bond required by the applicant in such sum, not less than $5,000 nor more than $50,000, and at *not less than 10 cents per bushel*

upon the capacity of the warehouse, as may be fixed by the chief inspector, the bond being conditioned upon "the faithful performance of his duties" as a public warehouseman;

License to be posted in a conspicuous place in the office room of the warehouse;

All grain, suitable for storage, and tendered in the usual manner to be *accepted up to capacity, without discrimination;*

Warehouse receipts to be issued, embodying full information and terms as set out in the statute, including clear indication as to whether the receipt is negotiable or nonnegotiable.

Warehouseman required to keep all stored grain insured against fire and other hazards *"for its full market value."*

Maximum charges fixed "for receiving, *insuring,* handling, storage and delivery of grain."

In case of loss by fire and upon demand by holders of warehouse receipts warehouseman required to make settlement upon the basis of market value of the stored grain.

Various requirements as to drying, cleaning, and safekeeping of grain.

Extensive provisions as to transfer or negotiation of warehouse receipts, including various provisions in protection of the rights of purchasers for value in good faith of negotiable receipts.

These and other provisions of the statute which might be noted indicate how broadly and specifically the legislature has imposed regulation upon grain warehouses. In the light of such regulatory statutes the appellee issued its policy—it cannot be heard to say otherwise. The rule is well established that in such a case the statute must be read into the contract. (85 A. L. R. 20, 28-32; 106 A. L. R. 516, 518.) 'Although, as appellee contends, the case of *Dunn v. Jones,* 143 Kan. 218, 53 P. 2d 918, may not be persuasive on other aspects of this case it is clearly in point upon the proposition that the provisions of a statute providing for compulsory insurance in a matter affecting the public interest must be written into the policy, and that no provision of the policy can be effective in contravention of the statute. We are therefore only concerned, in this connection, with the question of what the nature of the policy is when construed in connection with the terms and clear intent of the statute.

We first consider briefly appellee's contention that the policy protects no one's interests except Bunds' for the reason that it does

not contain the words "for whom it may concern" or their equivalent. In the first place, the policy itself recites that it covers "grain . . . handled or used by the insured in their business, their own, or *held by them in trust or on storage*, if in case of loss the insured is legally liable therefor." In the second place it is too clear to require discussion that the primary purpose of the statute, in the matter of insurance, is to protect the public, the depositors of stored grain, and the bona fide holders of warehouse receipts. To hold that the policy does not cover the grain itself, or that it is only intended to indemnify Bunds against claims against him by the storers of grain would distort the policy and undermine the statute. (29 Am. Jur. 214, 215; *Wilson Company v. Hartford Fire Insurance Co.*, 300 Mo. 1, 254 S. W. 266; *Utica Canning Co. v. Home Ins. Co.*, 116 N. Y. S. 934, 937, 938.)

Appellee further contends that since the statute provides that in case of loss by fire the warehouseman shall make settlement with grain depositors on the basis of market value, and that the depositors have right of action on the warehouseman's bond, those are the exclusive remedies and grain owners have no right of action against the insurance carrier. Adoption of that view would result, practically, in leaving the public unprotected save by the general credit and good faith of the warehouseman and by the bond. We think it was clearly the legislative intent to provide greater protection than that. The bond is conditioned upon faithful performance of all the many duties imposed upon the licensee by the statute—proper handling and care of the grain, keeping the grain insured, etc. We are advised that in the instant case the amount of the bond is $5,000—far less than the losses alleged by appellants, to say nothing of losses by other depositors. The maximum bond, under the statute, is for $50,000. The fact that the maximum bond would in countless cases be wholly inadequate coverage is another indication that the bond was not intended as the only public protection supplementary to the credit and good faith of the licensee—the latter being at times valueless. Again the fact that warehouse receipts are generally negotiable—as they were in the instant case—and that the receipts—upon forms prescribed under the act—recite upon their face that the grain they represent is covered by fire insurance, is persuasive indication that the owners were not to be left solely to recovery from the licensee or upon the bond.

Another indication of legislative intent is that the bond may be

written on the basis of only ten cents a bushel, while the insurance must cover full market value.

One further and significant provision of the statute is to be noted —the cost of the insurance is in fact paid by the owners who store the grain. The statute specifically and properly provides for its inclusion in the warehouse fees. (G. S. 1935, 34-235.)

Neither appellants nor appellees have called our attention to cases involving precisely the situation here presented and our own research has discovered none. But the principle which we think is here controlling has been often stressed. The case of *Ott v. American Fidelity & Casualty Co.*, 161 S. C. 314, 159 S. E. 635, 76 A. L. R. 4, involved a public liability policy given by a motor carrier under a statute similar to ours. The policy required as a condition for recovery that the assured give immediate written notice of an accident with fullest information then obtainable. In an action brought against it by an injured person the insurance company resisted upon the ground that no such notice had been given, and that it had no knowledge that the accident had occurred until summons was served. The court said:

"This position would undoubtedly be correct in a suit brought against the insurer by the insured, but the same rule would not necessarily apply in a suit by an injured member of the public. We must assume that the policy was intended not to evade, but to effectuate the purposes of the statute in compliance with which it was filed and it must be construed in the light of such statute." (Cases cited.) (p. 317.)

There is equal reason, here, why a defense as against the licensee should not bar recovery by the owners of the grain. In the Ott case, *supra*, the court also called attention to the general principle that a policy issued under the statutory requirement, for protection of the public "must be construed most strongly against the insurer."

Appellee argues that *Farney v. Hauser*, 109 Kan. 75, 198 Pac. 178, supports its contention that appellants have no right to sue upon the policy. We cannot agree. It was said in that case that it is the duty of the warehouseman, in case of loss, to collect the insurance not only on his own property but upon the "property entrusted or bailed to him." Cases may readily be imagined where the depositors might have occasion to hold him personally liable for having failed to do so. But the fact that the warehouseman has a right and duty to collect does not preclude direct action by the real parties in interest.

Before concluding we take note of section 34-2,103, G. S. 1935, the last paragraph of the act, which provides: "This act shall be

liberally interpreted and construed to effectuate its general purpose."

We briefly summarize. Grain warehouses have been impressed with a public interest and on that basis subjected to thoroughgoing regulation. Among the protective provisions is the requirement that grain be insured at full market value. This insurance is primarily for the benefit of those whose grain is received for storage and who pay the cost of carrying the insurance. Warehouse receipts are in most cases negotiable and holders are entitled to protection incident to negotiability.

Construing the warehouse contract, as we must, in connection with the above and other provisions of the statute, we are impelled to the conclusion that it establishes not only a contractual relationship between the insurance carrier and the warehouseman, but also between the carrier and those whose grain is covered by the policy. To hold otherwise would deny to holders of warehouse receipts the protection which the legislature intended they should have and which the insurance carrier in effect agreed to when it issued the policy. It follows that the appellants were entitled to bring action upon the contract and that recovery is not barred by the felonious act of Bunds.

The judgment is reversed and the cause remanded for further proceedings in harmony with this opinion.

WEDELL, J. (dissenting): I am convinced the decision in this case is wrong. With utmost deference to the views of the majority I desire to state frankly the principal reasons which impel this dissent.

Stripped to its bare essentials, the majority opinion means, first, that courts may substitute their own notions of public policy for a clearly defined public policy of the legislature, and second, that after courts have so substituted their own views, without authority or power to do so, they may write a different contract of insurance than that required by the legislature and substitute the new contract for a void contract in order to hold the insurance company liable rather than the warehouseman and his bondsman who the lawmakers said should be liable for the loss. All of this the court has done in the instant case notwithstanding the plain mandate that the act which the legislature has deemed wise—"shall be liberally interpreted and construed to effectuate *its* general purpose." (G. S. 1935, 34-2,103.) (Emphasis supplied.)

In order to give effect to the purpose of the act and the remedies provided therein it is necessary to ascertain the legislative intent

as reflected by its act. That shall be my purpose. It is upon the legislative intent and purpose, as I conceive it to be, that the instant dissent is based.

At the outset I desire to state: It is, of course, conceded the business of a public warehouseman is affected with a public interest. Otherwise there would have been no occasion for the lawmakers to legislate upon the subject as completely and exhaustively as they have, including the designation of the specific remedy for depositors of grain in the event the warehouseman breached his bond. I also agree it was the clear legislative intent and purpose that the warehouseman should obtain insurance on all the grain on deposit. The warehouseman was, however, required to do more than that. The legislature expressly required him *to keep* the grain insured and to keep it insured "for its full market value." (G. S. 1935, 34-236.) I also agree the insurance policy, written solely in favor of the warehouseman and not required by any statute to be written otherwise, covered all the grain stored in the warehouse.

I definitely disagree that it was the public policy or intent of the legislature to make the insurance company liable to the depositors of grain in the event the warehouseman deliberately burned the grain for the purpose of collecting the insurance. There is nothing in the act which even remotely intimates such a legislative intent. No statute requires a policy of insurance which will protect the grain *of all persons interested* in case the insured invalidates the policy by his own unlawful or wrongful act or acts. To be sure, the legislature possessed full power and authority to require such insurance. Whether, however, it would require such insurance was a matter of public policy which rested solely and exclusively within its own province and discretion. It is not within the province or power of the courts to say the legislature should have required such insurance and therefore the court will arbitrarily write such a provision into the policy. In the legislature's conception of public policy and adequate protection it did not require such insurance. (G. S. 1935, 34-236.) In its wisdom it, however, did see fit to make, and did make, definite provision for the protection *of all persons interested* in case the warehouseman in any manner violated his trust to fully perform all his duties as a public warehouseman. That provision for the protection *of all persons interested* was expressly placed in the bond which the legislature exacted from the warehouseman. (G. S. 1935, 34-229.) The bond was conditioned upon

the warehouseman's faithful performance of all his duties as a public warehouseman. (G. S. 1935, 34-229.) Manifestly one of those duties was to faithfully protect the grain on deposit. When he deliberately burned the warehouse and grain he clearly breached that duty and his bond. Another express statutory duty was *to keep* the grain insured "for its full market value against loss by fire." (G. S. 1935, 34-236.) When he voided the policy by unlawfully burning the grain for the purpose of collecting the insurance he obviously *did not keep* the grain insured. He did precisely the opposite. He destroyed the insurance according to the plain terms of the policy, which policy in no manner contravened any statute and which in no particular was insufficient under the requirements of any statute. Just what statutory requirement is there then that the majority has in mind which was omitted from the policy and which must now be read into the policy. I know of no such requirement and find none mentioned in the majority opinion that requires a policy of insurance which will make the insurance company liable to third persons if the insured voids the policy.

Furthermore the legislature has affirmatively fixed the liability under this precise circumstance so why should we, or how can we properly, ignore the legislative will? In the event the warehouseman failed *to keep* the grain insured for "its full market value" whom did the legislature, in its wisdom, see fit to make liable for the loss? The insurance company? Not at all. The legislature intended to make and in plain language specifically and expressly made the warehouseman liable *on his bond* for the "full market value" of the grain in that precise eventuality. (G. S. 1935, 34-236.) That such was the legislative intent is too clearly reflected even under the insurance provision of the act to admit of debate. The pertinent provision of G. S. 1935, 34-236, reads:

"Every local public warehouseman and every terminal public warehouseman shall *at all times keep* the grain stored in his warehouse insured in some reliable insurance company authorized to do business in the state of Kansas. Said grain is to be insured *for its full market value against loss by fire,* internal explosion, lightning and tornado *and failure so to do shall make the public warehouseman liable for the same on his bond.*" (Emphasis supplied.)

As previously stated, *the bond* was expressly required to be given *for the benefit of all persons interested.* (G. S. 1935, 34-229.) As also previously stated, no such provision was contained in the insurance policy or required in the policy by any statute. The legislative intent is therefore crystal clear. Upon what valid theory

then can the court substitute its own and a different public policy and remedy to recover the loss in case the warehouseman breaches his bond? I know of none when the legislature has so clearly and emphatically fixed the liability.

Now how does the majority seek to justify its conclusion that the grain warehouse act or that public policy requires the court to make the insurance company shoulder this loss? It does so, in part, upon the alleged theory that the bond required by the legislature is wholly ineffectual to provide adequate security for the loss. With that theory I am in complete disagreement. The majority view on that subject is not, to say the least, very complimentary to the good common sense and practicability of the law makers, many of whom were able lawyers, and conscientious public servants who were anxious to protect adequately all depositors of grain. Fortunately the act itself dispels any such impractical conception on the part of the lawmakers with respect to the statutory bond. While the first portions of the bond statute, G. S. 1935, 34-229, might at first blush lead one to believe the bond could be as low as $5,000, and the grain valued as low as ten cents per bushel, based on the capacity of the warehouse, and that the maximum amount of the bond was $50,000 upon a single warehouse, irrespective of the amount of grain deposited therein, the statute manifestly was not intended or designed to require a bond which did not adequately protect all the grain on deposit. The above provisions mentioned are followed with the words, "except as hereinafter provided, as shall be designated by said chief inspector," and the proviso reads:

"*Provided,* That whenever said chief inspector shall determine that *any bond given by any warehouseman is inadequate and insufficient security against any loss that might arise under the terms of such bonds then it shall be the duty of said chief inspector to require such additional bond or bonds as he shall deem necessary to provide adequate security;* and in any case where said chief inspector shall deem the surety upon any warehouseman and his bond to be of impaired financial condition, it shall be his duty to require a substituted or additional bond as he shall deem necessary." (Italics ours.)

It seems to me the legislature must have intended that no more grain should be deposited in any one warehouse than the maximum $50,000 bond would adequately secure ·and that in all events it was made the duty of the chief inspector to see that the bond adequately protected all of the grain on deposit to the extent of its actual market value. This construction is in harmony with all pertinent provisions of the act, including the section pertaining to

terminal public warehouses, which latter section provides that· if a local public warehouseman does not have storage space to handle the grain tendered to him he may accept it for shipment to a terminal public warehouse. (G. S. 1935, 34-241.)

If, however, there could be any possible lingering doubt concerning the legislative intent, as evidenced by the bond statute, to require a bond which would afford adequate protection *for the benefit of all persons interested* that doubt is completely dispelled by the provision of the insurance section previously quoted. By that section, as noted, the legislature plainly made the public warehouseman liable *on his bond* for the *"full market value"* of the grain, if the warehouseman *failed to keep* the grain insured "for its full market value." That provision also would be an utterly useless thing if the bond was not intended to provide adequate security. Undoubtedly the bond was intended to provide full security and it was expressly required to be written for the benefit of all persons interested. Any other interpretation renders the bond provisions a nullity and a useless gesture. Any other interpretation of the bond provisions certainly does not conform to the legislative mandate to liberally interpret and construe the act so as to effectuate the general purpose of the legislature.

The majority opinion appears to attach considerable weight to the fact the law requires that the storage fees of depositors shall include, among other things, the expense of insurance. Quite naturally it does. The legislature desired to make certain, insofar as it was able to do so, that the warehouseman would have no excuse for failing to keep adequate insurance on the grain he accepted. The legislature, of course, contemplated that in the event of a legitimate fire the insurance company would be liable for all loss to the warehouseman whom it had insured and that the depositors of grain should have the right to collect from the warehouseman out of the proceeds of insurance which he collected. The legislature therefore expressly provided the owner of grain, or the holder of a warehouse receipt, should make demand, not upon the insurance company but *upon the warehouseman,* for the loss. (G. S. 1935, 34-236.) And in case the grain was not *kept insured* by the warehouseman as required by law then the warehouseman should be liable on his bond for the breach of the bond. It is therefore clear the legislature sensibly provided adequate protection under every contingency. It provided full protection out of the insurance in case of an accidental

fire. It also provided full security on the bond, and to all persons interested, in the event of a breach of the bond, which in the instant case was the warehouseman's failure *to keep* the grain insured. The above remedies which the legislature prescribed are in nowise inconsistent with the requirement that the cost of insurance should be included in the storage fees. The very fact the legislature required depositors of grain to include the cost of insurance in the storage fees and that it did not require a type of insurance under which the loss would be payable to the depositors of grain as their interest might appear, in case the warehouseman voided the policy, is itself the strongest kind of evidence of the legislative intent not to make the insurance company liable under such circumstances. Under those precise circumstances the legislature preferred to make, and expressly made, the warehouseman liable on his bond to all persons interested. I know of no authority by which courts are empowered to thus ignore the legislative will.

The majority opinion also stresses the fact that the receipts for grain are negotiable in most instances and should therefore be protected. Some of them are negotiable (G. S. 1935, 34-244), and others are not (G. S. 1935, 34-243). I agree fully, as above indicated, that all grain deposited was clearly intended to be secured against loss. The two adequate methods the legislature provided for such security have been indicated. If the act is properly administered according to the legislative intent there is no need for any depositor of grain to suffer any loss. But just why should the insurance company be made to suffer the loss in the instant case, contrary to the clear legislative will, by reason of dereliction of duty, if such there was, on the part of the chief inspector to require the necessary bond? Frankly, I do not know.

I am forced to conclude that the court has misinterpreted the legislative will and has superimposed its own conception of public policy, which is contrary to that adopted by the legislature, in order to make the insurance company shoulder the loss. The United States of America, the principal intervenor so far as the amount of loss is concerned, or anyone else, knew, or should have known, that under the plain provisions of the act the warehouseman and his bondsman were the parties to whom they were required to look for recovery in case the warehouseman voided the policy by failure *to keep* the grain insured. They should be required to look to them now.

Furthermore let us examine the theory upon which appellants

seek recovery from the insurance company. They contend that by virtue of the policy and the act under which the policy was written they have a valid contract with the insurance company which permits them to recover on the policy. The majority opinion concedes and plainly states the policy in question was written in compliance with the requirements of G. S. 1935, 34-236, the insurance statute. That fact should end all question concerning the sufficiency of the policy itself. I previously, however, have discussed the fact that the policy in question does not contravene that or any other statutory requirement and that the policy was in no particular insufficient under the requirements of any statute. It is not contended there is a provision in the policy, or that a provision is required by any statute, such as is now frequently written into modern insurance policies to the effect that no act or neglect of the insured shall invalidate the policy as to the interests of other persons designated therein. It is definitely established in this state and generally that courts cannot arbitrarily read such a provision into a policy. (*Elmore v. Royal Ins. Co.*, 154 Kan. 93, 114 P. 2d 786, and numerous cases therein cited.) And in this case it will not do to say the above rule does not apply as a question of public policy is involved. Such a contention manifestly has no application here for the plain reason that here the legislature has preëmpted the field of public policy on the subject in question by adopting its own conception of what constitutes adequate protection of the public interest.

The instant policy does not by rider or otherwise even contain the provision that the policy protects the depositors of grain—to the extent that their interest may appear. What, however, is more important is the fact that no statute requires such a provision in the policy.

What about the contention then that appellants had a valid contract with the insurance company? They were neither named nor referred to in the policy in any manner whatsoever. Of course, they had no contract with the insurance company, valid or otherwise. The contract was made solely between the insurance company and the warehouseman in conformity with the insurance statute. But let us pursue appellants' contention that they had a contract with the insurance company. If they did have such a contract they manifestly were bound by its terms. (*Deruy Motor Co. v. Insurance Co.*, 146 Kan. 233, 235, 237, 69 P. 2d 677; *Elmore v. Royal Ins. Co.*, supra, p. 97.) Under its terms the deliberate and admitted

burning of the grain by the warehouseman for the purpose of collecting the insurance voided the policy. That ended appellants' rights under the policy. That ended their rights under the only policy the legislature had required. Obviously when the legislature has spoken on the subject of public interest and has failed to give appellants rights under the policy superior to those of the insured, courts cannot on the theory of public policy give appellants greater rights in the policy than the insured.

The decision of the majority is based upon a new contract of insurance which the court has made and substituted for one which, to the legislature, was entirely satisfactory in view of the fact that it had specifically required additional and adequate protection for all depositors of grain in the form of a statutory bond. Under these circumstances I think the court is wholly without power or authority to so make and substitute its own contract of insurance for the void contract.

I deem it unnecessary to pursue various other aspects of this lawsuit. Appellants cite no case which even remotely supports their contention. In my opinion no case cited in the majority opinion is authority for the right of the court to read into this insurance policy terms which are not required by statute and which make the insurance company liable for the loss. The case of *Dunn v. Jones*, 143 Kan. 218, 53 P. 2d 918, cannot possibly aid appellants' contention. That case is based upon the right and duty of courts to read into an indemnity policy certain provisions not contained in the policy but which were prescribed by statute. Certainly where such statutory requirements for a policy exist they must be read into the policy. The trouble here is no such statutory requirements exist with respect to the instant policy.

Considerable of the majority opinion is devoted to the view that the insurance policy was required by the legislature primarily for the protection of appellants. No statute required the policy to contain provisions which gave appellants any rights against the insurance company. Certainly they were given no greater rights by any statute or by the policy than the warehouseman had under the policy. But let us concede that the primary purpose of the insurance statute was to protect the depositors of grain to the extent that the legislature required them to be protected by insurance. What does that fact settle in this lawsuit? The fact remains the warehouseman did not keep the grain insured. As previously indi-

cated the legislature clearly did not intend to make the insurance company liable on a void policy. In case the warehouseman failed to keep the policy in force the legislature provided the specific remedy for appellants. It made the warehouseman and his bondsman liable to them for the full market value of the grain.

But let us, however, assume for the moment that the bond was not intended to provide adequate security for the loss in case the warehouseman failed to keep the insurance alive. Clearly the insurance company still would not be liable for the loss to appellants unless some law required the warehouseman to provide an insurance policy which would make the insurance company liable to them in case the warehouseman voided the policy. There is no law which even intimates the requirement of such a provision in the policy.

As previously indicated, the legislature, in its wisdom, saw fit not to make such a requirement notwithstanding the fact it had required the depositors of grain to pay the cost of the insurance to the warehouseman. The majority opinion disposes of this case just as though the legislature had actually made such a requirement and as though the legislature had given appellants the right to make a demand directly on the insurance company for the payment of their loss. The fact, of course, is the legislature neither made such an insurance requirement nor did it require the insurance company to settle with appellants even in case the warehouseman was entitled to recover. On the contrary, if the warehouseman was actually entitled to recover the legislature expressly required the warehouseman to make settlement upon demand by appellants out of the insurance he had collected. (G. S. 1935, 34-236.)

Considered entirely upon the basis of public policy as reflected by the legislature's own act and viewed entirely without regard to the purpose of the warehouseman's bond, it follows appellants cannot recover upon this policy which the insured deliberately voided for the purpose of collecting the insurance.

It also should be noted the majority opinion means that if the warehouseman fails to take out the insurance required by law, or for any reason permits the insurance to lapse, the legislature did not intend to provide appellants with other adequate security for their loss. I do not think that constitutes a liberal construction of the bond provisions for the protection of the depositors of grain.

I think the decision of the trial court was correct and should be affirmed.