**BARTLETT AND COMPANY, GRAIN,**
a Corporation, Appellant,

v.

**COMMODITY CREDIT CORPORATION,**
a Corporation, Appellee.

No. 16881.

United States Court of Appeals
Eighth Circuit.

Aug. 27, 1962.

Ralph M. Jones, Kansas City, Mo., made argument for appellant and Charles B. Blackmar, Kansas City, Mo., with him on the brief.

Alan S. Rosenthal, Dept. of Justice, Washington, D. C., made argument for appellee and William H. Orrick, Jr., Asst. Atty. Gen., Washington, D. C., F. Russell Millin, U. S. Atty., Kansas City, Mo., Morton Hollander and Herbert E. Morris, Attys., Dept. of Justice, Neil Brooks, Asst. Gen. Counsel, Giles H. Penstone, John A. Harris, Attys., U. S. Dept. of Agriculture, Washington, D. C., with him on the brief.

Before VAN OOSTERHOUT and BLACKMUN, Circuit Judges, and HENLEY, District Judge.

**HENLEY, District Judge.**

Appellant, the owner and operator of a public grain elevator in Kansas City, Kansas,[1] brought suit in the District Court to secure an adjudication that appellee, Commodity Credit Corporation, an agency of the United States (Commodity), is obligated to bear a portion of the expense paid or incurred by appellant in connection with a suit brought by it in the Missouri State courts to enforce collection of insurance covering certain grain stored in appellant's warehouse, some of which grain was owned by Commodity, following loss of and damage to the grain in the course of the Kansas City Flood of 1951. Commodity denied that appellant was entitled to the relief sought and, in addition, filed a counterclaim demanding a monetary judgment against appellant. Commodity's share in the insurance proceeds, finally collected by appellant, including interest to March 6, 1957, was $251,049.04. The ultimate decision of the District Court was that Commodity was not required to share in the litigation expense in the State courts and was entitled to judgment in the sum above mentioned plus interest at the rate of six percent per annum from March 6, 1957, the date upon which the insurance companies satisfied appellant's judgment. The complaint was dismissed and judgment was entered on Commodity's counterclaim. This appeal followed.

Two questions are presented for decision, namely, whether the District Court erred in holding that Commodity was entitled to recover its full aliquot part of the insurance proceeds without diminution on account of appellant's expenses in effecting collection; and whether, assuming that the District Court did not err in holding that Commodity was so entitled, the District Court erred in awarding interest on Commodity's basic recovery.[2] The first question may be con-

---

1. Appellant is a Missouri corporation which formerly operated under the name Hart-Bartlett-Sturtevant Grain Co.

2. Commodity's share of the insurance proceeds was $185,968.70. Between the time of the entry of the State court judgment and the time of the satisfaction of that

sidered as presenting the principal dispute between the parties.

The essential facts in the case are substantially undisputed. They may be summarized as follows:

The flood occurred in July 1951, and the grain in storage was damaged on July 14 of that year. At the time of the flood Commodity owned 60.2 percent of the grain in appellant's elevator. Appellant itself owned 39.42 percent, and the remainder was owned by other persons holding warehouse receipts issued by appellant.

■ The rights and obligations of appellant and Commodity with respect to the latter's grain stored in the former's elevator were governed not only by appellant's warehouse receipts and by general Kansas statutes regulating public warehousemen, but also by a Uniform Storage Agreement executed by appellant and Commodity in 1950.

Section 15 of the storage agreement deals with insurance and is as follows:

" * * * Without in any way limiting his obligation under the other provisions of this agreement, the warehouseman shall insure and at all times keep insured, in his own name, all the grain for the full market value thereof * * * against loss or damage by fire, lightning, inherent explosion, windstorm, cyclone, or tornado, and, in the event of any loss or damage to the grain or to the warehouse, whether or not such loss was insured against, he shall immediately notify Commodity and the holders of the warehouse receipts * * * and he shall at his own expense promptly take the steps necessary to collect any moneys which may be due as indemnity for such loss or damage, including the bringing of suit, and, as soon as collected, shall pay to the holders of such warehouse receipts * * * such moneys as may be collected for the loss

or damage. * * * The warehouseman shall pay to the holders of the warehouse receipts and certificates, in addition to the insurance proceeds, any amount by which the insurance proceeds are less than such full market value, whether resulting from failure to collect in full from the insurer, failure to obtain a policy affording full coverage, or failure to report the total value of grain on hand on the last reporting date under a reporting form of policy. In the event the warehouseman insures against hazards to the grain not specified herein, such insurance shall inure to the benefit of the holders of the warehouse receipts and certificates."

Appellant obtained policies or certificates of insurance covering all grain in the elevator and insuring against certain hazards including inherent explosions and other explosions. For its own protection appellant also obtained insurance against loss due to interruption of business by certain hazards. The explosion coverages of the policies protecting the grain were identical to the explosion coverages of the policies protecting appellant against loss due to interruption of business. None of the policies covered loss or damage caused by flooding as such.

When the flood waters entered the elevator, large quantities of grain were soaked and caused to expand. The effect of this expansion was such that about a third of the bins in which the grain was stored were caused to burst violently, and as the bursting proceeded, more and more grain came in contact with the water and was ruined.

On September 10, 1951, appellant, Commodity, and the other warehouse receipt holders entered into a written contract, referred to in the record as the Post-Flood Agreement. This agreement recognized the existence of a dispute between certain of the parties "as to the

judgment certain interest accrued, and Commodity's share of the accrued interest was $65,080.34. The total of those sums

or $251,049.04 at times will be referred to herein as Commodity's basic recovery.

basis upon which the loss * * * shall be allocated." It provided among other things that money collected on account of insurance on the grain would be maintained in a separate account pending a determination as to the ultimate allocation of the loss either by agreement or by court judgment. It was further provided that nothing in the agreement should be construed as an admission of the applicability of any particular statute regulating public warehousemen, or of the correctness of any particular interpretation of any statute; and it was recognized that Commodity did not waive any rights under its Uniform Storage Agreement. The Post-Flood Agreement contained certain provisions as to salvage and other matters which are not of immediate concern here.

In order to bring the losses within the coverage of the policies it was necessary to characterize them as having been due to explosion rather than to flood. Proofs of loss were prepared based on that characterization and were presented to the insurance companies which refused to recognize liability under the policies. Appellant then filed suit against the companies in the Circuit Court of Jackson County, Missouri, and after protracted, hotly-contested, and expensive litigation, appellant finally prevailed. Hart-Bartlett-Sturtevant Grain Co. v. Aetna Insurance Co., 365 Mo. 1134, 293 S.W.2d 913, cert. den. 352 U.S. 1016, 77 S.Ct. 562, 1 L.Ed.2d 548.[3]

On August 13, 1953, an official of appellant addressed a letter to an official of Commodity's Kansas City, Missouri, office, discussing a number of related matters and proposing a basis of settlement of the loss. In the letter appellant took the view that the insurance coverage invoked by appellant in the State court litigation was not required by the Uniform Storage Agreement, and the suggestion was made that Commodity either agree to participate in the litigation ex-

pense or that it waive participation in any insurance proceeds. In its reply to that letter Commodity did not refer one way or the other to the suggestion relative to the expense of the State court litigation.

On September 17, 1954, appellant and Commodity entered into a written contract relating primarily to salvaged grain, but referring to the insurance litigation. As to that litigation it was recognized that Commodity by entering into the contract did so without prejudice to such rights as it might have to recover a part of any proceeds of the State court suit.

About the middle of January 1958, almost a year after the State court judgment had been satisfied, appellant submitted to Commodity a statement of account showing an allocation of the grain recovery and of the expenses incident thereto.[4] That statement showed that Commodity's share of the proceeds of the insurance on the grain should be charged with expenses amounting to approximately $80,000 and that there was due Commodity the net sum of $179,351.-47. The statement was accompanied by appellant's check in the amount just mentioned, which was tendered in full satisfaction of Commodity's claim.

Commodity refused to accept appellant's check in full settlement of the claim and returned the check on January 27, 1958. Commodity stated that it was willing to consider the $179,351.47 figure as an offer in compromise. Negotiations between the parties went on for the remainder of 1958, but Commodity at length refused to accept less than its full aliquot part of the insurance recovery without any diminution on account of appellant's litigation expense, it being Commodity's position that it was the obligation of appellant under the Uniform Grain Storage Agreement to institute and prosecute the State court litigation at its own expense. Negotiations having

3. The suit was commenced in 1952. The Supreme Court of the United States denied certiorari on February 25, 1957.

4. A copy of this statement was attached to the complaint as an exhibit. No one quarrels with the computations reflected in the statement.

failed, this suit was filed in January 1959.

The basic dispute between the parties was resolved by the District Court in favor of Commodity by granting on October 18, 1960, Commodity's motion for summary judgment. In connection with that decision the District Court filed a memorandum opinion, not published, and supplemented that opinion with another unpublished memorandum dated November 16, 1960.

The decision of the District Court that appellant was required to bear all of the expenses of the State court litigation was based primarily upon the language of section 15 of the Uniform Grain Storage Agreement. The Court appears also to have relied to some extent on section 34–236, G.S.Kan., 1949.[5]

In attacking the District Court's holding that Commodity was not required to bear any part of the expense incident to appellant's effecting recovery on its policies, appellant contends principally that the District Court misconstrued the Uniform Grain Storage Agreement, that the Court erred in holding that the Post-Flood Agreement and the conduct of the parties thereunder did not modify appellant's original obligation to prosecute the State court litigation at its own expense, if such obligation ever existed, and that the District Court misconstrued the Post-Flood Agreement when it held that said agreement did not provide for deduction of the litigation expenses of collection before distributing the net proceeds. It is further contended that when appellant instituted and prosecuted the State court litigation under the explosion theory, it went beyond any contractual duty which it owed to Commodity and embarked upon a highly speculative and expensive course of litigation not contemplated by the parties when they entered into the Uniform Grain Storage Agreement, and that appellant's prosecution of the suit in the State court resulted in the creation of a fund which it was not obligated to create and in which Commodity should not be permitted to share unless it is prepared to bear its just portion of the expense incident to the creation of the fund.

Appellant's "creation of a fund" contention was summarized by the District Court as follows:

" * * * Basically, its [appellant's] contention is premised in the legal proposition, that when a person expends labor and effort in the creation of a fund which inures to the benefit of himself and others, such others are obliged to bear their fair share of the expense of creating the fund as a condition of sharing in the proceeds; as laid down in Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157; Wallace v. Fiske, 8 Cir., 80 F.2d 897. Auxiliary thereto * * * is the contention that a casualty of the magnitude of the 1951 Flood and litigation of the complexity and difficulty of proof of the explosion case, were not within the reasonable contemplation of the parties at the time of the execution of the 'Uniform Grain Storage Agreement' by plaintiff and Commodity, and that Commodity is estopped to contend that no charge can be made against it on account of fees and expenses of litigation incurred, for the reason that Commodity tacitly acquiesced in the prosecution of said suit, without ever claiming that plaintiff was bound to maintain the

---

5. That statute is summarized by the District Court as follows: "Section 34–236, G.S.Kan., 1949, required plaintiff to insure the grain in its elevators 'for its full market value against loss by * * * internal explosion * * *' and the same statute gave to the holders of warehouse receipts issued by plaintiff on grain stored in its elevator 'a first lien, to the extent of the value of grain at the time of destruction at the place where stored, on all such insurance for any loss or injury sustained by them on account of the destruction or injury of such grain by * * * internal explosion, * * * or any other cause covered by such insurance policy.'" The Court then referred to Farney v. Hauser, 109 Kan. 75, 198 P. 178; and Miller's National Insurance Co. v. Bunds, 158 Kan. 662, 149 P.2d 350, 153 A.L.R. 176.

suit at its own expense, or that it was entitled to the entire amount of its loss recovered, without abatement, until after the termination of the litigation. Hence plaintiff says that the rights and liabilities of the parties in this action are to be governed by the general rule above stated, and not by any contract relation between the parties. * * *

"The long and short of plaintiff's contention is, that plaintiff feels it took a gamble in instituting suit on the certificates of insurance in question; that it spent a great deal of time, effort and expense in a hard-fought legal battle to obtain the recovery that it made therein; that as a result of all this, Commodity has been benefited, without sustaining any of the burden cast on plaintiff; therefore, plaintiff asserts in this action that it has the right to have the Court declare, under general principles of law, rather than any contracts existing between plaintiff and defendant, that Commodity may be charged with a portion of the expense of prosecution and concluding the suit in which recovery was made, and that the claim otherwise made by Commodity is so lacking in equity that it cannot be allowed, unless compelled by express language in an unequivocal contract between the parties."

■ We agree with the District Court that this equitable contention of appellant cannot be sustained if under the contract appellant was required to institute and prosecute at its own expense such suits against the insurance companies as might be necessary to effect recovery under the policies. If that obligation existed under the contract or was imposed by statute, the District Court had no right, and this Court has no right, to mitigate that obligation simply because its discharge may have turned out to be more onerous than the parties may have contemplated originally. The equitable principle, invoked by appellant, that one who would share in a

fund created by another must bear a fair share of the expense of bringing the fund into existence has no application where the creator of the fund was under a legal obligation to create it at his own expense.

Likewise, we agree with the District Court that the Uniform Grain Storage Agreement imposed upon appellant the obligation to commence and prosecute to conclusion, at its own unaided expense, any suit which might be necessary to collect insurance on the grain, regardless of whether the outstanding insurance policies covered the specific hazards mentioned in the storage agreement or whether the policies covered some other hazard or hazards, and regardless of whether the necessary litigation turned out to be simple and inexpensive or speculative, complicated, and costly. We think that this result follows when the storage agreement and the words contained therein are given their reasonable, fair, and ordinary construction.

When appellant entered into the agreement which obligated it to carry insurance on the grain and to collect that insurance at its own expense, it had no right to assume that collection of insurance proceeds in the event of loss would be quick, easy, or cheap. Appellant must certainly have known that it is not unusual for insurance companies to deny liability on policies, and that insurance litigation is frequently burdensome and expensive. Appellant entered into its contract with Commodity in the hope of gain, and presumably it considered the profits which it hoped to derive to be a sufficient consideration for its undertakings, including its undertaking to keep the grain insured and to collect the insurance.

Any apparent harshness of this conclusion tends to evaporate when it is remembered that appellant had insurance not only on Commodity's grain but on its own grain as well and also had insurance protecting its own business. Appellant thus had a personal interest in effecting recovery on the policies, and there is nothing to indicate that a suit on the business interruption policies alone would

have been substantially less onerous, speculative, or expensive than a suit on all of the policies.[6]

■ As to the Post-Flood Agreement, we think that the District Court correctly concluded that said agreement was intended merely to preserve the status quo pending final settlement of disputes and differences either by agreement or by litigation. Moreover, that agreement itself recites that it was made without prejudice to Commodity under the Uniform Grain Storage Agreement. Nor do we see anything in the conduct of Commodity after the Post-Flood Agreement was executed which would estop Commodity from asserting its full rights under the original contract, which rights had become vested upon the happening of the loss.

■ Appellant's contention that the District Court erred in ignoring the Missouri attorney's lien statute, Mo.Rev. Stats., 1949 and 1959, § 484.130, V.A. M.S., is insubstantial. Assuming *arguendo* that as between appellant's lawyers and Commodity the former would have a lien on the recovery superior to the claim of the latter, that does not help appellant. As between appellant and Commodity, it was the duty of appellant to pay its attorneys either out of its share of the proceeds or otherwise, and it cannot use the attorney's lien statute to shift that obligation to Commodity.

Coming now to the subsidiary dispute as to the propriety of the District Court's award of interest on Commodity's principal recovery from March 6, 1957, the Post-Flood Agreement provided that proceeds of the "salvage of grain sold or disposed of by the Warehouseman shall be held by him as Trustee in a special account for the benefit of the persons entitled thereto" until such time as the "method of distribution of the loss shall be determined"; and that agreement provided further that money "collected by any party hereto" from any insurance

company for loss or damage to the grain "will be maintained in a separate account" pending the determination of how the loss should be apportioned and distribution made "according to agreement of the parties or by final adjudication of a court of competent jurisdiction."

The parties have stipulated that when the judgment against the insurance companies was satisfied, the entire proceeds, including appellant's own share thereof, were paid to appellant's attorneys and by them deposited in a special account in a Kansas City, Missouri, bank. The account was in the name of the attorneys as "Trustees for Bartlett & Co., Grain, and Warehouse Receipt Holders of 7–13–51."

It has also been stipulated that throughout the year 1957 the attorneys invested and reinvested the proceeds in 90-day Treasury Bills. The reinvestments included increments to the original investments. By January 9, 1958, the bills purchased from time to time had earned interest allocable to the insurance on the grain amounting to $12,212.68, of which sum $7,354.48 (60.2%) was credited to Commodity on the account submitted by appellant.

On January 14, 1958, the attorneys endorsed and delivered to appellant the Treasury Bills then on hand, and also turned over to appellant the sum of $2,-266.37 which they had on hand as uninvested cash. The cash was immediately commingled with appellant's general funds. The bills were carried as an asset item in appellant's general investment account and were not earmarked or distinguished from any other securities held by appellant. However, the bills had ascertainable identities and were held by appellant until they matured on March 6, 1958, at which time they had a value of $810,000, including an increment of $6,358.50.

On March 6, 1958, appellant reinvested from the proceeds of the Treasury Bills

---

6. It has been stipulated that appellant's recovery for interruption of business, including interest to March 6, 1957, was $368,866.74, and that its own recovery for lost or damaged grain, including interest to the date aforesaid, was $164,358.76.

turned over to it in January the sum of $408,606.20. The Treasury Bills purchased with that sum, which sum was more than ample to protect the interests of Commodity, were held until their maturity on June 5, 1958, at which time they had a value of $410,000, including an increment of $1,393.80.

On June 5, 1958, the bills just mentioned were cashed by appellant, and the proceeds thereof were deposited in appellant's general bank accounts, and used by appellant for its own purposes. At all times appellant recognized that Commodity was entitled to at least $179,351.-47 and carried that amount as a liability item on its books.

In its original counterclaim defendant prayed judgment against appellant in the sum of $251,049.04 plus six percent interest from March 6, 1957. Nothing was said in that pleading about increments to that sum, and no specific complaint was made as to the administration of the proceeds following the payment of the State court judgment. However, it seems that the question of increments got into the case prior to the filing of the District Court's memorandum opinion of November 16, 1960.

■ In that opinion the District Court considered and rejected Commodity's claim for interest on its principal recovery from March 6, 1957. The view was taken that under the Post-Flood Agreement appellant was under no obligation to distribute the proceeds of the State court judgment until after the basis of distribution had been determined finally, and that pending such determination Commodity's share of the proceeds did not bear interest. The District Court was also of the opinion that the method of distribution was not determined until the basic controversy between the parties was decided by judgment in this action, and that interest should run only from rendition of such judgment. The Court specifically refrained from passing on the question of increments. The holdings of the District Court expressed in the opinions of October 18 and November 16, 1960, were incorporated into a

formal judgment dated November 18, 1960, and filed November 21, 1960.

Subsequently, Commodity sought and obtained a reopening of the case and leave to amend its counterclaim so as to ask in addition or, as an alternative to interest, an accounting for increments or profits accruing to or earned by the insurance proceeds subsequent to March 6, 1957. The matter was submitted to the District Court on factual stipulations, the controlling ones of which have been abstracted heretofore. While the stipulations showed that after June 5, 1958, all of the insurance proceeds had been fully commingled with appellant's general assets, no attempt was made to show whether or to what extent appellant profited or lost from its use of the proceeds after the commingling.

The issues raised by the amendments to the counterclaim were disposed of by the District Court by means of a memorandum and order dated April 10, 1961, and an order dated May 15, 1961. The District Court concluded that Commodity was entitled to simple interest on its principal recovery from March 6, 1957, but was not entitled to any additional accounting for increments and profits. Commodity has not appealed from that determination.

Appellant contends that there was no legal or contractual basis for the award of any interest on Commodity's principal recovery, and that the award made was inequitable and an abuse of the District Court's discretion.

■ It is evident from the District Court's memorandum of November 16, 1960, and from its order of May 15, 1961, that the District Court considered that Commodity's share of the insurance proceeds constituted a trust fund, and that the award of interest was in lieu of requiring appellant to account for the administration of the fund and for increments and profits. In making its decision the District Court applied the principle, recognized in Missouri as elsewhere, that where a trustee wrongfully commingles trust funds with his own property, and

 

where there is no evidence as to the profits earned by the use of the funds after the commingling, the Court, in its discretion, may, in lieu of ordering an accounting, simply charge the trustee with interest on the trust funds at the legal rate, the trustee being permitted to retain the profits, if any, and being required to bear the loss, if any, resulting from the use of the funds. See Buder v. Fiske, 8 Cir., 174 F.2d 260, and authorities there cited.

As to the period after June 5, 1958, we think that the District Court was fully justified in charging appellant with interest at the stated rate on Commodity's principal recovery. Regardless of whether appellant was technically a trustee of the insurance proceeds, it was certainly under an obligation to keep them separate from its own funds and was not free to commingle them with its own assets and use them as its own. Having so commingled and used the proceeds and having failed to make any showing as to actual profits derived from their use, appellant cannot complain of being required to pay interest from the date of the wrongful commingling. Buder v. Fiske, supra.

However, we do not think that appellant should be charged six percent interest on the principal recovery for the period between March 6, 1957, and June 5, 1958. During that period of time Commodity's principal recovery was evidenced by Treasury Bills in the hands of appellant's attorneys and in appellant's own hands,[7] and those bills which in the circumstances were reasonable and prudent investments did not yield six percent. The amount of the actual yield of the bills is known, and the claim of Commodity for the period now in question should be limited to its pro rata share of the yield.

To the extent indicated the judgment appealed from will be modified and as modified will be affirmed. The parties should be able to agree on the necessary computations. If they cannot do so, further recourse to the District Court may be had. All costs will be taxed against appellant.

---

7. It should be observed that appellant was not required to hold the proceeds of its own business interruption policies in trust, but such proceeds were so held during all of 1957 after March 6. Further, all of the insurance proceeds continued to be represented by identifiable bills down to March 6, 1958, and after that date, as pointed out, bills held by appellant and identifiable as insurance proceeds were more than adequate to protect the interests of Commodity. Thus, until June 5, 1958, insurance proceeds could be traced definitely into appellant's assets.