No. 38,982

FLOUR MILLS OF AMERICA, INC., a Corporation, *Appellant*, v. BURRUS MILLS, INCORPORATED, a Corporation, *Appellee*; JEAN WOODS, *Appellant*; WOLCOTT & LINCOLN, INC., a Corporation, *Appellee*; and BATES GRAIN COMPANY, INC., a Corporation, *Appellee*.

(258 P. 2d 341)

Opinion filed June 6, 1953.

*Edgar Shook* and *E. P. Mitchell*, both of Kansas City, Mo., argued the cause, and *John E. Blake*, of Kansas City, was with them on the briefs for the appellant, Flour Mills of America, Inc., a corporation.

*Dick H. Woods*, of Kansas City, Mo., argued the cause, and *J. E. Schroeder*, of Kansas City, was with him on the briefs for the appellee, Burrus Mills, Incorporated, a corporation.

The opinion of the court was delivered by

Price, J.: This was an action brought by Flour Mills of America, Inc., a corporation, for a declaratory judgment to determine who should bear the loss for a large amount of grain which was damaged as a result of the Great Flood of 1951 in the valley of the Kansas (Kaw) River. From a judgment adverse to its contentions plaintiff has appealed.

The basic question involved is whether our statute, G. S. 1949, 34-273, with reference to the disposition of "out of condition" grain stored in a public warehouse applies to grain which is damaged by flood waters. In other words, is grain thus damaged "out of condition" within the meaning of the statute?

The statute, although lengthy, is quoted in full:

"In case any public warehouseman shall discover that any grain stored in his warehouse, other than special bins, is out of condition, or is becoming so, and it is not in his power to preserve the same, he shall immediately give such notice of that fact to the owner of such grain or to the person in whose name the same is stored, as is reasonable and possible under the circumstances, and shall also give notice of such fact to the chief inspector. The chief inspector, unless otherwise requested by the owner of such grain, or the person in whose name the same is stored, shall cause an inspection to be made of such grain, and if it is found on such inspection that said grain is out of condition, or is becoming so, and the owner of said grain fails promptly to remove the same, the warehouseman may sell said grain upon giving the same public notice of sale as is required by this act for the sale of grain to satisfy the lien of a warehouseman: *Provided,* That said grain may be sold at either public or private sale without advertising, if, in the opinion of the chief inspector, such grain should be sold without delay and written authority to make sale without advertisement is given by him to the warehouseman: *Provided,* That for the purpose of this section the owner of such grain shall be deemed to be the holder of warehouse receipts of the oldest dates then in circulation or uncanceled and the grain represented by which has not previously been declared out of condition. Nothing herein contained shall be held to relieve any warehouseman from exercising due care and vigilance in preserving any such grain after discovery that the same is out of condition, or is becoming so, but such grain shall be kept separate and apart from all direct contact with other grain and shall not be mixed with other grain while in store in such warehouse. Any public warehouseman guilty of any act of neglect, the effect of which is to depreciate property stored in a public warehouse under his control, shall be liable on his bond therefor to the person damaged thereby. After grain has been sold as herein authorized, the warehouseman shall not thereafter be liable for the delivery of such grain even though the receipt therefor be negotiable, but shall be liable as a trustee for the amount of the proceeds of such sale in excess of the amount of any lawful charges for which he had a lien at the time of such sale."

With the possible exception of one or two matters, which, as will be developed, are immaterial for our purposes, the facts are not in dispute. The parties entered into a stipulation of certain facts, the material (for our purposes) portions of which are summarized as follows:

In 1951 plaintiff was engaged in the business of milling flour and, as such, bought, sold and stored grain, including milo, in public warehouses in the state of Kansas. Defendant, Burrus Mills, Incorporated, a corporation, was engaged in buying and selling grain and in operating public warehouses for the storage of grain in Kansas and other states. During 1951 it operated a terminal public warehouse for the storage of grain at or near Turner in Wyandotte County, such warehouse being commonly known as Santa Fe Elevator "A". Its operation of the elevator was such as to constitute it a public warehouseman within the meaning of Article 2, Chapter 34, G. S. 1949, and the elevator was at all times during 1951 a public warehouse and terminal public warehouse within the meaning of the Act, including G. S. 1949, 34-224 and 225, and was duly licensed by the Kansas State Grain Inspection Department.

On July 13, 1951, plaintiff was the owner and holder of uncanceled negotiable warehouse receipts issued by Burrus on the elevator in question, representing 470,000 bushels of No. 2 yellow milo. Two of such receipts, representing a total of 110,000 bushels, were dated April 23 and April 24, 1951.

On July 13, 1951, Burrus was the owner and holder of uncanceled negotiable warehouse receipts issued by it on the elevator representing 546,306.04 bushels of No. 2 yellow milo. The earliest date of these receipts was May 9, 1951.

On July 13, 1951, defendant, Bates Grain Company, Inc., a corporation, was the owner and holder of uncanceled negotiable warehouse receipts issued by Burrus on the elevator representing 14,869.14 bushels of No. 2 yellow milo. The earliest date of these receipts was June 1, 1951.

On July 13, 1951, defendant, Jean Woods, was the owner and holder of an uncanceled negotiable warehouse receipt issued by Burrus on the elevator representing 117.28 bushels of No. 2 yellow milo. This receipt was dated December 21, 1949.

On July 13, 1951, defendant, Wolcott & Lincoln, Inc., a corporation, was the owner and holder of uncanceled negotiable warehouse receipts issued by Burrus on the elevator representing 30,000 bushels

of No. 2 yellow milo. The oldest date of these receipts was May 18, 1951.

It will be seen that with the exception of the receipt owned and held by defendant Jean Woods, representing 117.28 bushels, two of the receipts held by plaintiff, and representing 110,000 bushels, were of the oldest dates.

On July 13, 1951, there was on deposit at the elevator in question an aggregate quantity of 1,061,292.46 bushels of comingled No. 2 yellow milo, none of which was specially binned.

For several weeks prior to July 13, 1951, the entire watershed of the Kansas River had been deluged with rains of great intensity, resulting in the river carrying a very large volume of flood water. During the week preceding July 13th the heavy rains continued, resulting in the river suddenly overflowing and flooding large industrial areas along its watercourse, including the area where the Burrus elevator was located. On July 13th flood waters entered the elevator to a height of approximately twenty feet, as a result of which large amounts of comingled No. 2 yellow milo, a fungible grain stored therein, were made wet, and as a result thereof were rendered of a grade and quality inferior to that called for by the warehouse receipts issued for such grain. Other No. 2 yellow milo, in addition to that which came into direct contact with the flood waters, became of a grade and quality inferior to that called for by warehouse receipts issued for such grain as a result either of the chemical or mechanical processes set in motion in the grain that was subjected to the direct flood waters or by the warehouseman's inability to turn or otherwise care for such grain. As a direct result of the entry of flood waters into the elevator on that date, and the chemical and mechanical processes thereby set in motion in the grain stored therein, a total of 90,053.38 bushels of No. 2 yellow milo became wet and damaged and was not therefore of the same grade and quality as that called for by the warehouse receipts issued for it. During the next twenty days the bottoms of nine bins, all containing yellow milo, ruptured or broke loose, causing approximately 6,000 bushels to fall to the basement area immediately below the bins.

On July 14th Burrus gave to all interested parties all notices required by the statute (G. S. 1949, 34-273). Ten days later the chief inspector of the Kansas State Grain Inspection and Weighing Department notified Burrus by letter that he had inspected the elevator and found that some of the grain stored therein was out

of condition and that more of it was rapidly becoming so, and authorized Burrus to sell and dispose of all grain in such condition at public or private sale, upon such terms and conditions as Burrus deemed necessary and desirable to obtain the highest and best possible price therefor. Plaintiff and the other owners of outstanding negotiable uncanceled warehouse receipts for No. 2 yellow milo consented to the salvaging of all flood damaged No. 2 yellow milo by dumping (if it was unfit for sale for any purpose), or by public or private sale, without advertising or further notice, and without surrender of the warehouse receipts issued for such grain, with the proceeds of such sale to be placed in a separate trust account for the benefit of the owners thereof.

Plaintiff and the other owners of the comingled No. 2 yellow milo, after having been notified by Burrus of the fact the grain so stored was out of condition, or was becoming so, and that Burrus was powerless to preserve the same, failed to remove promptly such wet and damaged grain from the elevator for the reason that under the circumstances and flood conditions then existing it was impossible for the owners or any one else to remove the same promptly. After the flood waters had subsided Burrus, in accordance with official instructions, and with the consent of plaintiff and other owners, sold all of the damaged grain and deposited the proceeds in a separate trust account for the benefit of the owners thereof.

At all times between May 9, 1951, the date of the last official "weigh-up" of the elevator prior to the flood, and the time of the flood on July 13th, the stocks of No. 2 yellow milo stored therein were equal to the quantities and grades as shown by all warehouse receipts issued and outstanding therefor, and at the instant flood waters entered the elevator all of the grain stored therein was in the condition and of the grade and quantity called for by issued, outstanding and uncanceled warehouse receipts. Any lawful charges, including those for which Burrus may have had a lien at the time of the sale of the wet and damaged grain, and the allocation of the expenses of salvaging such grain between Burrus and the other owners thereof, are not in issue, and neither is the question of the existence or nonexistence of negligence on the part of any party with respect to the storage, protection, handling, removal or salvaging of such grain.

The parties expressly reserved the right to offer further evidence and the right to object to any portion of the stipulation of facts on

the grounds of materiality or relevancy upon the trial of the cause, and it was expressly agreed that nothing in the stipulation should constitute an admission by plaintiff that G. S. 1949, 34-273, is applicable to the controversy.

In the main, it may be said plaintiff's contention is that the damaged grain is not grain "out of condition"; that the statute in question is therefore inapplicable; that even though plaintiff be found to be the owner and holder of warehouse receipts of the oldest dates then in circulation and uncanceled, sole liability on its part for the loss may not be predicated thereon, and that liability of plaintiff, as a tenant in common with all other depositors of the entire mass of comingled grain, should be on a pro rata basis, that is, in the proportion that the portion thereof for which plaintiff holds warehouse receipts bears to the whole quantity of such grain on deposit at the time of the flood.

Defendant Burrus contends the statute applies to flood-damaged grain; that the grain so damaged was "out of condition" within its meaning, and that plaintiff, by virtue of being the owner and holder of warehouse receipts of the oldest dates then in circulation and uncanceled to the extent of 110,000 bushels, is therefore deemed to be the owner of such damaged grain and the one to bear the loss.

Contentions of other parties defendant need not be noted.

On the trial of the action plaintiff introduced considerable evidence, both oral and written exhibits. The former dealt generally with practices and customs concerning the management and operation of large elevators and the handling and care of grain stored therein. It will not be detailed. A number of witnesses with years of experience in the grain and elevator business testified that the phrase "out of condition" grain has a particular and specific meaning in the grain business, but the court sustained objections to their testifying as to what that meaning is.

Defendants offered no evidence and rested their case at the conclusion of plaintiff's case.

In general, the findings of fact filed by the trial court follow the stipulation of facts heretofore summarized. Several will be noted, however.

Finding number eight was to the effect that as a direct result of the flood waters, and the chemical and mechanical processes thereby set in motion, a total of 90,053.38 bushels of No. 2 yellow milo became *out of condition* and inferior in grade and quality to that called for by the warehouse receipts.

Finding number thirteen was to the effect that of this amount of *out of condition* grain the oldest uncanceled negotiable warehouse receipts outstanding were held by defendant Woods for 117.28 bushels, and plaintiff for 110,000 bushels.

Finding number fourteen reads:

"That Section 34-273, General Statutes of Kansas, 1949, is unambiguous, and the words 'out of condition' as used therein relating to grain, have a common and well understood meaning, that the grain has become inferior in grade and quality from that specified in the uncancelled negotiable warehouse receipts."

The conclusions of law material for our purposes are to the effect the statute in question applies to and controls comingled grain stored in public warehouses rendered *out of condition* by contact with or inundation by flood waters; that the owners of the 90,053.38 bushels of grain thus rendered *out of condition* are defendant Woods to the extent of 117.28 bushels, and plaintiff to the extent of 89,936.10 bushels, and that they are therefore entitled to the net proceeds of the salvage and sale of such grain in the same proportion as the total quantity of their oldest outstanding warehouse receipts bears to the total quantity of such *out of condition* grain.

In other words, the effect of the court's decision is that plaintiff and defendant Woods must bear the entire loss.

Plaintiff's motion for a new trial, containing numerous grounds, covers some six pages of the abstract, but on account of our view as to the proper disposition of this case the contents thereof will not be detailed or summarized. In connection with this motion plaintiff offered affidavits of those expert witnesses who were not permitted to testify as to the meaning in the grain trade and business, of the phrase *"out of condition"* grain. The substance of these affidavits is that there is a difference between flood-damaged grain and out of condition grain as the terms are used in the grain trade in this area, and that "out of condition" grain, as used in the grain and warehouse trade, means grain which has gradually deteriorated and depreciated in grade and quality *due to causes or factors inherent in the grain itself.* The affidavits also are to the effect that out of condition grain may be used for human consumption or in mixed formula feeds, whereas flood-damaged grain cannot be so used, and that the meaning ascribed by affiants to the term "out of condition" grain had existed long prior to 1931 when the statute in question was enacted.

The motion for a new trial was overruled and judgment was

entered in accordance with the conclusions of law heretofore referred to.

Plaintiff and defendant Woods have appealed and the latter has joined in the abstract and brief of plaintiff.

The specifications of error are fourteen in number, but as we view this case the whole matter can and should be narrowed down to one question and that is whether "out of condition" grain referred to in G. S. 1949, 34-273, includes flood-damaged grain such as we are dealing with here.

We are convinced beyond all doubt that the lower court was in error in holding that the statute applies to the facts of this case.

The construction and interpretation of the statute is a question of law, rather than of fact, as denominated by the court in its finding number fourteen, quoted above. We agree with the holding that "out of condition" grain is grain that has become inferior in grade and quality to that specified in the uncanceled negotiable warehouse receipts, but we cannot and do not agree that comingled grain stored in a public warehouse, and which is damaged by flood waters and thus rendered inferior is "out of condition" grain as that term is used in the statute.

It was error to exclude the testimony by expert witnesses concerning the well-established meaning in the grain and warehouse trade of the term "out of condition" grain. Our statute, G. S. 1949, 77-201, *Second,* provides:

"Words and phrases shall be construed according to the context and the approved usage of the language; but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in law, shall be construed according to such peculiar and appropriate meaning."

This rule of statutory construction is elementary and universal, as is indicated by the following two citations. In *O'Hara v. Luckenbach S. S. Co.,* 269 U. S. 364, 46 S. Ct. 157, 70 L. Ed. 313, the court quoted with approval the following from an English decision:

"If the Act is one passed with reference to a particular trade, business, or transaction, and words are used which everybody conversant with that trade, business, or transaction knows and understands to have a particular meaning in it, then the words are to be construed as having that particular meaning, though it may differ from the common or ordinary meaning of the words."

In Sutherland, Statutory Construction, 3rd Ed., Vol. 2, § 4919, pp. 441 and 442, the rule is thus stated:

"Statutes dealing with trade and commerce are intended for practical use and application by men engaged in trade and commerce. There are many trade

and commercial terms with a common meaning; some with both a common and a technical meaning; and some with only a technical meaning. The general rule is that in the absence of a legislative intent to the contrary, commercial terms when used in a statute relating to trade or commerce are presumed to have been used in their trade or commercial meaning."

However, merely because the court erred in excluding evidence in this respect we are not limited in our disposition of this case to reversing and remanding the cause for a new trial. This action is for a declaratory judgment to determine who should bear the loss—in other words—to determine the legal question whether the statute applies.

In our opinion the very language of the statute itself excludes it from having application to the facts before us, and in stating our reasons we resort to and adopt plaintiff's contentions.

The statute refers to perishable grain or grain that will injure other property. It comes into operation when a public warehouseman shall discover that any grain stored in his warehouse, other than special bins, is " out of condition," or is becoming so. Clearly this indicates a concealed or latent condition developing in the grain. There is a duty on the part of the warehouseman to preserve the grain if it is in his power to do so. Obviously he is powerless to eliminate flood waters or to preserve grain submerged in a flood. The statute provides for notices to be given and con- templates that the owner of such grain be given an opportunity and time to remove it, and yet the facts are that everyone was powerless to remove grain from this elevator during the flood. The statute also provides for advertising and sale of the "out of condi- tion" grain; that the warehouseman is not relieved of the duty of exercising due care and vigilance in preserving any such grain after discovery that it is "out of condition," and that it shall be kept separate and apart from all direct contact with other grain. These and other provisions of the statute obviously contemplate gradual degradation or deterioration of the grain, and not sudden and uncontrollable damage caused by flood waters, for in such case there is no opportunity to do any of the acts enumerated in the statute, and we think it is clear it was not intended to apply to circumstances which admit of no time within which or opportunity to do any of the acts made mandatory by it.

And there is still another reason why we think the statute does not apply to grain damaged by flood waters. There is absolutely no relation between grain thus damaged and the age of the ware-

house receipts or the age of the grain on deposit. As a basis for abrogating vested titles in a proportionate part of all the comingled grain and assigning the ownership of "out of condition" grain to the owner and holder of the oldest warehouse receipts undoubtedly the legislature felt that responsibility for the grain going out of condition should rest on the person who had the oldest grain on deposit, with the idea in mind that the owner of the oldest receipt was that person, on the theory there is a causal relationship between the age of the receipt and the fact the grain for which it was issued had deteriorated. It is true that as a practical matter, in view of the methods of operation of large grain elevators, the oldest outstanding receipt may not represent the oldest grain in storage, but, in theory, at least, we think the basis used by the legislature has a logical foundation. Certainly there is no connection whatever between the oldest grain in storage, the oldest outstanding receipt therefor, and flood damage. Suppose an empty elevator is half filled with grain on a Monday and receipts, dated that day, are issued to A. On Tuesday it is completely filled and receipts for such additional grain, dated that day, are issued to B. A few days later a flood occurs and half of the grain is damaged. Is it logical to assume that the legislature, in the enactment of the statute, intended that under such circumstances A should be deemed to be the owner of the damaged grain? We think not. The grain in question was not "out of condition" grain within the meaning of the statute.

In this connection it is interesting to note that certain exhibits received in evidence, being copies of letters and circulars sent out by the Board of Trade of Kansas City, Missouri, to its members shortly after the flood, referred to grain in the Kansas City area as "flood-damaged grain," "water-damaged grain" and "water-soaked grain," rather than as "out of condition" grain.

Holding as we do that the flood-damaged grain is not "out of condition" grain within the meaning of the statute in question, and that the statute has no application to such a situation, the next question is—who is to bear the loss?

There is but one answer, and that is—all of the owners and holders of warehouse receipts for the grain in storage at the time of the flood, on a pro rata basis.

The outstanding receipts did not represent specific grain. They represented a proportionate part of all that kind and grade of grain

on deposit in the elevator on the date of their issuance. Each of the receipt holders was an owner in common with all other holders of receipts representing that type and grade of comingled grain. No one of them owned a separable or identifiable quantity of it. In *Zuber v. Minshall,* 123 Kan. 595, 256 Pac. 806, the following statement from 6 C. J. 1097 was quoted with approval:

"Where grain is deposited in an elevator or in a warehouse on an understanding, express or implied, that the warehouseman may mix it with other grain of like quality, and shall return to the depositor the amount of his deposit out of the mass which is to be kept good to that extent, the various owners of the grain are tenants in common, . . ." (p. 597.)

In 56 Am. Jur., Warehouses, § 167, pp. 397, 398, the general rule is stated:

"The various depositors of mingled fungible goods are tenants in common of the entire mass. Hence, where, for any cause not occasioned by the fault of any depositor, the amount of grain on hand becomes less than that for which there are outstanding receipts, the loss as between the depositors is borne by each of them at the time of the loss in the proportion which his grain bears to the entire mass deposited." (See also § 28, p. 334, same volume.)

And so here. The loss occasioned by the flood waters should be borne by all of the holders of outstanding negotiable uncanceled warehouse receipts, without reference to the dates thereof, as tenants in common on a pro rata basis, that is, in the proportion that the portion thereof for which each holds receipts bears to the whole quantity of such grain on deposit at the time of the flood. Entirely aside from the fact the statute under consideration has no application to the facts of this case, the conclusion just reached is in harmony with all equitable principles, fair dealing and common justice.

All other contentions advanced by the parties in their excellent and exhaustive briefs have been noted, but in view of our decision need not be mentioned or discussed.

As there is no dispute concerning the amount of such grain in storage at the time of the flood, the amount damaged, or the number of bushels represented by the receipts held by the various parties to this action, the rendition of a proper judgment will be merely a matter of mathematical calculation. The judgment of the lower court is therefore reversed with directions to enter judgment consistent with what has been said in this opinion.