# CENTRAL STATES CORP.
## v.
## LUTHER.

In re GARDEN GRAIN & SEED CO., Inc.

No. 4791.

United States Court of Appeals, Tenth Circuit.

Aug. 13, 1954.

Rehearing Denied Sept. 7, 1954.

Pickett, Circuit Judge, dissented in part.

Samuel Morgan, Chicago, Ill. (W. A. Kahrs, Wichita, Kan., with him on the brief), for appellant.

Malcolm Miller, Wichita, Kan., for appellee.

William C. Farmer, U. S. Atty., Wichita, Kan., Warren E. Burger, Asst. Atty. Gen., Melvin Richter and John G. Laughlin, Dept. of Justice, Neil Brooks, Associate Solicitor, Washington, D. C., Giles H. Penstone, Kansas City, Mo., Donald A. Campbell, Washington, D. C., Gerald J. O'Rourke, Dept. of Agriculture, Washington, D. C., on the brief for the United States amicus curiae.

Before BRATTON, HUXMAN and PICKETT, Circuit Judges.

BRATTON, Circuit Judge.

This is a controversy arising in a bankruptcy proceeding. Garden Grain and Seed Company, Inc., was a licensed warehouseman under the laws of Kansas, and it operated elevators in that state in which grain was received for storage and transfer. Under date of January 16, 1952, the corporation was adjudged a bankrupt, and a trustee was seasonably selected. At the time of adjudication, the bankrupt had in its possession 4,320,-900 pounds of milo which was later sold under order of the bankruptcy court for $103,995.25. The proceeds of the sale were placed in a special fund, and the controversy revolves around certain claims to the fund.

Central States Corporation, hereinafter referred to as the claimant, filed in the proceeding a reclamation petition and proof of debt. It was alleged in the pleading that on November 14, 1951, the claimant purchased from the bankrupt 100,000 bushels of milo and paid therefor $127,680; that the bankrupt issued an invoice showing the sale; that the milo purchased was immediately stored by the claimant in the warehouse of the bankrupt; that the bankrupt issued twenty negotiable warehouse receipts in the form authorized by the laws of Kansas, each receipt showing ownership in the claimant of 5,000 bushels of milo stored in the warehouse of the bankrupt; that at the direction of the claimant and upon surrender of eight of such warehouse receipts, the bankrupt released to the claimant 33,577 bushels and 38 pounds of milo; and that the bankrupt failed to deliver to the claimant as owner thereof the balance of the stored grain although demand had been made for such delivery. In like terms, it was alleged that on November 29, 1951, the claimant purchased from the bankrupt 50,000 bushels of milo for which it paid $65,800; that an invoice was issued; that the grain was immediately stored by the claimant in the warehouse of the bankrupt; that ten negotiable warehouse receipts were issued, each showing ownership in the claimant of 5,000 bushels of milo stored in the warehouse of the bankrupt; and that although demand had been made therefor, the bankrupt failed to deliver such grain to the claimant. And similarly, it was alleged that on December 15, 1951, the claimant purchased from the bankrupt 50,000 bushels of milo for which it paid $68,880; that an invoice was issued; that the grain was immediately stored by the claimant in the warehouse of the bankrupt; that ten negotiable warehouse receipts were issued, each showing ownership in the claimant of 5,000 bushels of milo stored in the warehouse of the bankrupt; and that although demand had been made therefor, the bankrupt had failed to deliver such grain to the claimant. It was further alleged that each of such receipts created a trust fund of milo of which the corporation was trustee and the claimant was cestui que trust; that such trust funds were commingled with other trust funds of a similar nature evidenced by warehouse receipts; that the grain owned by the claimant and not delivered by the bankrupt was or should be in the possession of the bankrupt; and that the value of such grain was $219,487.61. Copies of the warehouse receipts were attached to the pleading. Each receipt was designated as negotiable and contained the statement that the bankrupt had received from the claimant a specified number of bushels of milo "in store"; that the bankrupt was "not the owner of the

grain covered by this receipt, either solely, jointly, or in common with others"; and that the milo thus deposited by the claimant with the bankrupt "has been graded * * * and may be stored with other grain of the same grade". The prayer of the pleading was that the claimant have judgment for the possession of the milo and funds in the possession of the trustee as thereinbefore alleged; that the court fix and establish claimant's liens against the property of the bankrupt and the property in the possession of the trustee as thereinbefore alleged; and that the claimant be allowed a general claim for the difference, if any, between the value of the milo, cash, liens, and securities received by the claimant and the sum of $219,487.61. The trustee admitted payment of the three sums to the bankrupt; admitted that the claimant did not receive 9,319,650 pounds of milo for which it held warehouse receipts; and denied that the claimant had any lien on any of the assets coming into the hands of the trustee. And by amendment to the answer, the trustee pleaded that the claimant received from the bankrupt 1,880,350 pounds of milo which was not owned by the bankrupt or the claimant, but was owned by persons who had deposited it with the bankrupt for storage. In addition to answering the petition of the claimant, the trustee filed an action in the nature of an interpleader. The claimant and others were joined as parties. It was alleged among other things in the petition in interpleader that the claimant asserted a claim to the fund but that the trustee did not believe it had any valid rights therein. The prayer was that the court adjudge and decree the owners and respective proportions of ownership of the various claimants to such fund in the hands of the trustee arising from the sale of the milo found among the assets of the bankrupt; and that the court adjudge and decree that the claimant and certain others had no interest in such fund.

After making findings of fact and conclusions of law, the referee entered an order determining that the claimant was not entitled to an equitable lien upon or priority to the special fund in the hands of the trustee; that the claimant should retain as its own property 1,013,159 pounds of milo which it received from the bankrupt; that it should return to the trustee to be placed in the special fund 867,191 pounds of milo, or the value thereof which was fixed at $19,771.95; and that upon the return of the grain or payment of the money, the claim of the claimant would be allowed in the sum of $239,259.56 as a common claim. On petition for review, the district court sustained the order of the referee, and the claimant appealed. For convenience, continued reference will be made to the parties as claimant and trustee, respectively.

The referee concluded that the warehouse receipts held by the claimant were invalid and the district court in effect sustained the conclusion. The claimant challenges that conclusion. It asserts that the receipts are valid. The question must be determined under the laws of Kansas. Interstate Banking & Trust Co. v. Brown, 6 Cir., 235 F. 32, certiorari denied, 242 U.S. 632, 37 S.Ct. 15, 61 L.Ed. 537. Chapter 194, Laws of 1931, section 34–223 et seq., General Statutes of Kansas 1949, relates to the warehousing of grain in public warehouses. The act is elaborate but only part of its provisions have any present material bearing. Authority is contained in the act for the issuance of two kinds of warehouse receipts. Section 34–239 authorizes the issuance of receipts for grain stored in a warehouse licensed under the act and provides the essential contents of such receipts. Section 34–240 authorizes a public warehouseman operating a warehouse to make a valid sale or pledge of warehouse receipts issued for grain of which he is the owner, either solely or jointly or in common with others, and provides that the recital of such ownership in the receipts shall constitute notice to all the world of the right to sell or pledge the same and of the title or specific lien of

the transferee or pledgee upon the warehouseman's grain represented by such receipts, provided that such receipts are registered according to the provisions of the act. Section 34–243 defines a nonnegotiable receipt. Section 34–244 defines a negotiable receipt. Section 34–246 provides that no warehouse receipt shall be issued except upon actual delivery of grain into the warehouse from which it purports to be issued. Section 34–247 provides for the appointment and qualification of registrars of receipts. Section 34–248 provides that it shall be the duty of every public warehouseman issuing negotiable receipts upon receipt of grain to issue or cause to be issued a receipt therefor in compliance with the act, and to file with the registrar a report showing the amount of grain received, the name of the owner thereof, and the numbers of receipts therefor issued, accompanied by the warehouse receipts for registration. The statute further provides that a public warehouseman must in all cases register every negotiable receipt issued by him for grain of which he is the owner, either solely, jointly, or in common with others. And the statute further provides that upon receipt of such report and warehouse receipts, it shall be the duty of the registrar to register such legal receipts in a book to be kept for that purpose and to stamp on each of them with the official state grain inspection department registration stamp the word "registered" with the date of registration, and affix his signature thereto. Section 34–290 makes it a criminal offense for a warehouseman, or any officer, agent, or servant of a warehouseman, to issue or aid in the issuance of a warehouse receipt knowing that the grain for which such receipt is issued has not been actually received by such warehouseman, or is not under his actual control at the time of the issuance of such receipt. Section 34–291 makes it a criminal offense for a warehouseman, or any officer, agent, or servant of a warehouseman, fraudulently to issue a receipt for grain, knowing that it contains a false statement. And section 34–298, provides that unless otherwise provided in the act, any person, firm, or corporation, or any officer or agent of any person, firm, or corporation, who shall violate any of the provisions of the act shall be guilty of a misdemeanor. It will be observed with poignant significance that the pertinent language contained in the act in respect to receipts not being issued unless the grain has been actually deposited with the warehouseman and is under his control, as well as the language in respect to receipts issued for grain of which the warehouseman is the owner being registered, is not directory or permissive. Such provisions in the act are unequivocal, mandatory, and imperative. And they represent the considered public policy of the state in respect to the matters falling within their compass. Millers National Insurance Co. v. Bunds, 158 Kan. 662, 149 P.2d 350, 153 A.L.R. 176.

■ The claimant did not deliver any grain to the bankrupt for storage. No physical deposit of grain was made and none was ever intended by the parties. The receipts were never registered and the word "registered" was never stamped upon them with the official registration stamp. The claimant knew that no grain was deposited with the bankrupt for storage, and it knew that the receipts did not indicate on their face that they had been registered. The receipts were not conventional bona fide vouchers issued to a depositor of grain. Neither were they receipts for grain belonging to the bankrupt and then presently stored in its warehouse. It seems clear that the transactions between the claimant and the bankrupt, which included as an integrated part thereof the issuance and delivery of the receipts, did not conform to the statutory exactions of the state in respect to the issuance of warehouse receipts. Our attention has not been called to any case decided by the Supreme Court of Kansas involving the validity of warehouse receipts issued under similar or fairly comparable cir-

cumstances to those present here. But in Kipp v. Goffe & Carkener, 144 Kan. 95, 58 P.2d 102, 108 A.L.R. 918, it was held that one dealing with a warehouseman who had not been licensed under the act was bound to know that the warehouseman had no right, power, or authority as a public warehouseman to receive grain for storage or transfer for the public; and that one storing grain with such a non-licensed warehouseman and taking receipts therefor could not invoke the protection of the act. If one who accepts from a warehouseman not licensed under the act receipts for grain stored in his warehouse cannot invoke the protective provisions of the act, it must follow by appropriate analogy that where one, in disregard of the act, obtains warehouse receipts from a licensed public warehouseman without depositing with such warehouseman any grain for storage and without the receipts being registered in the manner specified in the act cannot be heard to urge with success that the receipts were validly issued under the act and therefore constitute sustainable basis for the assertion in bankruptcy of a right of reclamation, an equitable lien, or preferred claim. First Camden National Bank & Trust Co. v. J. R. Watkins Co., 3 Cir., 122 F.2d 826.

Another contention advanced is that, having traced the money which it paid to the bankrupt into purchases of milo deposited in the elevators of the bankrupt and there commingled with the common mass of milo which ultimately came into the hands of the trustee, the claimant is entitled to have such common mass of grain impressed with a constructive trust or equitable lien in its favor, even though no express fiduciary relationship ever existed between the claimant and the bankrupt. It is said in support of the contention that the money which the bankrupt received from the claimant was paid for the specific purpose of purchasing and depositing for the claimant milo in the warehouses of the bankrupt; that in violation of its clear duty, the bankrupt converted, misappropriated, and wrongfully used such money to acquire grain in its own name; and that in such circumstances a constructive trust or equitable lien in favor of the claimant was created and should be recognized. Although no evidence whatever was adduced which tended to show that the claimant paid its money to the bankrupt with the understanding that the bankrupt would use it to purchase grain for the claimant and deposit such grain in the name of the claimant in the elevators belonging to the bankrupt, that fact may be assumed for the moment. Payment of the money to the bankrupt with the understanding that it would be used to purchase grain which would be stored in the name of the claimant in the elevators of the bankrupt, and the wrongful misappropriation of such money to acquire and deposit grain in the name of the bankrupt, standing alone, was not sufficient to vest in the claimant any right to a constructive trust, an equitable lien, or other priority of claim upon the milo which went into the hands of the trustee. It was not enough for the claimant merely to show that its money or the grain purchased therewith went into the assets of the bankrupt. In order for the claimant to be entitled to a constructive trust, an equitable lien, or preferred claim in the proceeds arising from the sale of the milo which reached the hands of the trustee, it was encumbent upon the claimant to show clearly that the milo purchased with the money which the claimant paid to the bankrupt went into the common mass of milo which reached the hands of the trustee and was later sold. Hoffman v. Rauch, 300 U.S. 255, 57 S.Ct. 446, 81 L.Ed. 629; Kershaw v. Jenkins, 10 Cir., 71 F.2d 647; Johnson v. Morris, 10 Cir., 175 F.2d 65.

The claimant apparently recognizes that, as a prerequisite to the establishment of a constructive trust or an equitable lien, the legal duty rested upon it to trace into the common mass of milo which reached the hands of the trustee milo purchased with money which the claimant paid to the bankrupt. To discharge the burden of proof resting

upon it, the claimant relies heavily upon certain facts and circumstances shown upon the trial. At the time of the first transaction between the claimant and the bankrupt, the bankrupt was insolvent; its liabilities on warehouse receipts and storage tickets issued for milo exceeded the amount of milo which it then had in storage; and it had in its bank account a balance of only $435.13. At the time of the second transaction, the bankrupt was insolvent; was short in its milo account; and the balance in its bank account was only $115.06. And at the time of the third and last transaction between the parties, the bankrupt was still insolvent; was still short in its milo account; and the balance in its bank account was $15,480.42. The three sums which the claimant paid to the bankrupt were promptly deposited in the bank account of the bankrupt and they augmented such account by the respective amounts thereof. And immediately after the making of each deposit, the bankrupt spent large sums of money for milo. But continuously from the time the claimant made its first payment to the bankrupt to the filing of the petition in bankruptcy, the bankrupt was actively engaged from day to day in the grain and elevator business. It received grain for storage, shipped grain which had been stored, bought and sold grain on its own account, received money from various sources, paid money for various purposes, and kept its money in a single bank account into which money was deposited and against which checks were drawn. In other words, the bankrupt received and delivered or shipped large quantities of milo and it received and paid out large sums of money. The money which the claimant paid to the bankrupt was commingled in the bank account with more than $700,000 obtained from other sources and was expended in the conduct of the business. And as we understand the record, throughout the period involved here the bankrupt was short in its inventory position. The record presents a complicated factual situation, but it is fairly

apparent that continuously after the first transaction between the claimant and the bankrupt the bankrupt did not have in storage sufficient milo to discharge its obligations under outstanding warehouse receipts, open storage tickets, and other like commitments to its depositors. The claimant failed to show clearly by augmentation or otherwise that the milo or any part thereof which reached the hands of the trustee was purchased with money which the claimant paid to the bankrupt. And in the absence of a clear tracing into the hands of the trustee of milo purchased with the money which the bankrupt received from the claimant, the right to a constructive trust, an equitable lien, or preferred claim upon the $103,995.25 in the special fund in the hands of the trustee was not established.

■ The question is presented whether the bankruptcy court had jurisdiction to determine in a summary proceeding the controversy in respect to the delivery to the claimant of the 867,191 pounds of milo. A court of bankruptcy does not have jurisdiction to adjudicate in a summary proceeding a controversy respecting property which is held adversely to the bankrupt estate without the consent of the adverse claimant. Unless the adverse claimant consents to the adjudication of the controversy in that manner, resort must be had to a plenary suit. Harrison v. Chamberlin, 271 U.S. 191, 46 S.Ct. 467, 70 L.Ed. 897. The claimant did not challenge the jurisdiction of the bankruptcy court to adjudicate in a summary proceeding the controversy in respect to the grain which it received from the bankrupt. Instead, it litigated the question on its merits and thus impliedly consented to the adjudication of the controversy in that manner. Accordingly, the order is not fatally infirm for want of jurisdiction of the bankruptcy court to adjudicate in a summary proceeding the controversy in respect to the grain received from the bankrupt.

■■ The turn-over provision in the order of the referee is challenged upon

the further ground that the controversy in respect to the return of the 867,191 pounds of grain or payment of the value thereof was one between third parties which did not involve the bankrupt or its property and therefore the bankruptcy court did not have jurisdiction to adjudicate it. It is the general rule that a bankruptcy court is without jurisdiction of a controversy solely and exclusively between third parties which does not involve directly or indirectly the bankrupt or his property. In re Chakos, 7 Cir., 24 F.2d 482; Evarts v. Eloy Gin Corp., 9 Cir., 204 F.2d 712, certiorari denied, 346 U.S. 876, 74 S.Ct. 129. But a court of bankruptcy does have jurisdiction and power to determine a dispute between third parties concerning the ownership of property in which neither the bankrupt nor the trustee has title if it is impossible to administer completely the estate of the bankrupt without determining the controversy. In re Burton Coal Co., 7 Cir., 126 F.2d 447; In re International Power Securities Corp., 3 Cir., 170 F.2d 399. The grain which the bankrupt delivered to the claimant had been in the custody of the bankrupt as bailee. The depositors of such grain are creditors of the bankrupt estate. The claimant is also a creditor. Manifestly, it would be impossible to administer the bankrupt estate completely without determining whether the claimant shall return to the trustee the grain which the bankrupt delivered to it or pay the value thereof because upon the adjudication of that question depends the amount of the claims of the depositors against the bankrupt estate and the source or sources from which such claims shall be paid in whole or in part. And in these circumstances, the jurisdiction of the bankruptcy court was broad enough to include the adjudication of the controversy as to whether the claimant should return the grain to the trustee or pay the value thereof. In re Burton Coal Co., supra; In re International Power Securities Corp., supra.

One remaining contention urged for reversal of the judgment merits discussion. That contention is that the turnover provision contained in the order of the referee was improperly and illegally included therein. It is said in support of the contention that the milo delivered to the claimant was purchased by the claimant in good faith and paid for in full; that it represented property acquired with the claimant's money; and that it did not constitute a preferential transfer. It is further said that the creditors of the bankrupt have no legal or moral right to the grain purchased with the claimant's money. And it is further said that having traced its money into the commingled fund of milo which came into the hands of the trustee, and having established an equitable lien or constructive trust upon such fund, it must be held that the claimant had the right to enforce its warehouse receipts pro-rata by accepting the delivery of grain made to it. It is the well established rule of law in Kansas and elsewhere that where owners of grain deposit it with a warehouseman for storage with an express or implied understanding that it will be mixed with other grain of like kind and quality, the relationship among the several depositors is that of tenants in common of the commingled mass, the relationship between them and the warehouseman is that of bailors and bailee with the deposited grain being redeemable by grain of similar kind, quality, and quantity, and the right of the warehouseman to sell or make other disposition from the common mass is limited to the excess thereof over and above the quantity necessary to redeem the receipts or other commitments issued to the depositors. Moses v. Teetors, 64 Kan. 149, 67 P. 526, 57 L.R.A. 267; Zuber v. Minshall, 123 Kan. 595, 256 P. 806; Flour Mills of America v. Burrus Mills, 174 Kan. 709, 258 P.2d 341; Kastner v. Andrews, 49 N.D. 1059, 194 N.W. 824; Carson State Bank v. Grant Grain Co., 50 N.D. 558, 197 N.W. 146; Torgerson v. Quinn-Shepherdson Co., 161 Minn.

380, 201 N.W. 615; Hoven v. McCarthy Bros. Co., 163 Minn. 339, 204 N.W. 29. The referee found as a fact that the bankrupt delivered to the claimant milo in the amount of 867,191 pounds when it did not have in the common mass any excess over and above the amount required to discharge its obligations to depositors of milo. Therefore, the delivery to the claimant of that grain amounted to a transfer from the common mass which did not belong to the bankrupt but to the depositors thereof as tenants in common. Of course, the claimant could not be blameworthy for adopting any legal course to save itself from financial loss arising out of its dealings with the bankrupt. But it did not have any warrant in law to enforce pro-rata its rights against the bankrupt by accepting the delivery of grain which belonged to the depositors thereof, not the bankrupt.

A bankruptcy court is a court of equity and is guided by equitable principles and doctrines except when they are inconsistent with the Bankruptcy Act, 11 U.S.C.A. § 1 et seq. Continental Illinois National Bank & Trust Co. v. Chicago, Rock Island & Pacific Railway Co., 294 U.S. 648, 676, 55 S.Ct. 595, 79 L.Ed. 1110; Securities and Exchange Commission v. United States Realty & Improvement Co., 310 U.S. 434, 455, 60 S.Ct. 1044, 84 L.Ed. 1293. In passing upon the allowance of claims, a bankruptcy court sits as a court of equity clothed with jurisdiction to sift the circumstances surrounding any claim to see that injustice and unfairness is not done in the administration of the bankrupt estate. Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; W. F. Sebel Co. v. Hessee, 10 Cir., 214 F.2d 459. And acting within the framework of the Bankruptcy Act, a court of bankruptcy has power to subordinate the claim of one creditor to the claims of other creditors where subordination is necessary to prevent the consummation of conduct which is inequitable; has power to attach appropriate conditions to the allowance of a claim; and has power to require a claimant to do equity before receiving equity in the proceeding. Pepper v. Litton, supra; American Surety Co. of New York v. Sampsell, 327 U.S. 269, 66 S.Ct. 571, 90 L.Ed. 663; Heiser v. Woodruff, 327 U.S. 726, 66 S.Ct. 853, 90 L.Ed. 970; In re Erickson, 7 Cir., 106 F.2d 937; In re Commonwealth Light & Power Co., 7 Cir., 141 F.2d 734; In re Kansas City Journal-Post Co., 8 Cir., 144 F.2d 791; In re V. Loewer's Gambrinus Brewery Co., 2 Cir., 167 F.2d 318. Having received from the bankrupt 867,191 pounds of milo which did not belong to the bankrupt but to the depositors thereof, it would be a devastating impingement upon plain principles of equity to permit the claimant to retain unto itself such grain or the value thereof and at the same time share ratably with such depositors and other creditors in the distribution of the assets of the bankrupt estate. The order requiring the claimant to return the grain referred to or pay the value thereof, and conditioning the allowance of the claim of the claimant as a common claim upon the return of such grain or payment of the value thereof, was well within the discretion of the bankruptcy court.

The judgment is Affirmed.

PICKETT, Circuit Judge (dissenting in part).

I concur in the majority opinion except that part which upholds the so-called "turnover order". This order conditions the allowance of the Central States' claim as a common creditor upon its delivery to the trustee of 867,191 pounds of milo, or its value, fixed at $19,771.95.

The referee found that this amount of grain did not belong to the bankrupt, but was the property of those who had deposited it in the bankrupt's elevator. Concededly, this grain could not become an asset of the bankrupt estate. When received, the trustee will deliver it, or its value, to the depositors. It will not in the slightest degree affect the assets of the bankrupt. It is true that a deter-

mination of the title to the grain may affect the amount of the claim of the depositors or Central States, but it will not affect the bankruptcy estate. So long as Central States retains the grain, its claim will be reduced and the claim of the depositors will be increased in the amount of the value of the grain. If the grain was wrongfully delivered, the depositors could proceed directly against Central States to recover the grain, or the amount which they have been damaged, and I think it is a matter to be settled between the claimants outside the bankruptcy court. If this type of a proceeding, as it related to this particular grain, is sanctioned, it will permit the use of the broad powers of the bankruptcy court to be used in a summary manner to adjudicate claims to property in which the trustee has no interest and will result in no benefit to the bankrupt estate.

It is recognized that the bankruptcy court does not have jurisdiction over controversies exclusively between third parties which do not involve the bankrupt or his property. Evarts v. Eloy Gin Corp., 9 Cir., 204 F.2d 712, certiorari denied 346 U.S. 876, 74 S.Ct. 129; In re Lubliner & Trinz Theatres, 7 Cir., 100 F.2d 646; Smith v. Chase Nat. Bank of City of New York, 8 Cir., 84 F.2d 608. It is said that the bankruptcy court does, however, have jurisdiction and power to determine disputes between third parties concerning the ownership of property which does not belong to the estate, if it is impossible to completely administer the bankrupt estate without determining that dispute. In re Burton Coal Co., 7 Cir., 126 F.2d 447, and In re International Power Securities Corp., 3 Cir., 170 F.2d 399, 405, are cited as authority for these statements. The proceedings in these cases were for reorganization. In the Burton Case there was a dispute as to the ownership of stock in the bankrupt corporation which was seeking a reorganization. The court there said that the reorganization could not proceed without a settlement of that dispute. In the International Power Case, the question of jurisdiction arose over the right to enjoin or dispose of bonds of the corporation which was seeking reorganization. In upholding its jurisdiction, the court stated that the "reorganization could not be formulated prior to the resolution of the questions of ownership of the bonds and the asserted equitable rights." The facts in those cases clearly distinguish them from this case. I have found no case which has upheld the jurisdiction of the bankruptcy court in an ordinary bankruptcy proceeding to enter a turnover order with respect to property which was not claimed as the property of the bankrupt estate. Collier on Bankruptcy, 14th Ed., Sec. 23.10. I would hold that the bankruptcy court does not have jurisdiction to determine the depositors' title to grain which had been delivered to a purchaser prior to bankruptcy. It appears to me that the trustee is assuming the burdens and expense of the grain depositors in this matter.

In determining the amount of grain which Central States was required to account for and turn over, the referee allowed Central States to retain only the overage which the bankrupt owned at the date the purchase was made. The purchaser of grain from a warehouseman who receives delivery at a time when the warehouseman has a shortage is as a general rule, liable to the depositors of grain for the amount in excess of his pro rata share. 56 Am.Jur. Warehouses Sec. 208. But, if subsequent to the excessive delivery the warehouseman substitutes other grain therefor and places it in the commingled mass, then the title to the substituted grain is vested in the depositors and holders of the warehouseman's receipts. State ex rel. Hermann v. Farmers Elevator Co., 59 N.D. 679, 231 N.W. 725, 727; Carson State Bank v. Grant Grain Co., 50 N.D. 558, 197 N.W. 146; Kastner v. Andrews, 49 N.D. 1059, 194 N.W. 824, 827–829; Hall v. Pillsbury, 43 Minn. 33, 44 N.W. 673, 7 L.R.A. 529; National Exchange Bank

v. Wilder, 34 Minn. 149, 24 N.W. 699. The evidence does not disclose, and the referee made no finding, as to the condition of the bankrupt's grain account after delivery to Central States was made. Consequently, I am of the view that the turnover order was based upon improper criteria and cannot stand.