In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.

Application of IRVING TRUST COMPANY to impress constructive Trust or Declare Equitable Lien.

No. 70-347.

United States District Court, E. D. Pennsylvania.

Sept. 21, 1971.

Blank, Rome, Klaus & Comisky, by Marvin Comisky, Goncer Krestal, and Norman L. Holmes, Philadelphia, Pa., Special Counsel to Trustees, Penn Central Transp. Co.

John F. Bomster, Jr., Philadelphia, Pa., for Trustees, Penn Central Transp. Co.

Dilworth, Paxson, Kalish, Levy & Coleman, by David Pittinsky, Philadelphia, Pa., and Davies, Hardy, Ives & Lawther, by F. Martin Bowne, New York City, for Irving Trust Co.

Tate, Diamond, Polsky, Bauer & Ervin, by W. Bourne Ruthrauff, Philadelphia, Pa., for Richard Joyce Smith, Trustee, New York, New Haven & Hartford R.R.

Morgan, Lewis & Bockius, by John N. Schaeffer, Jr., Philadelphia, Pa., for Fidelity Bank.

Ballard, Spahr, Andrews & Ingersoll, by Morris Cheston, Jr., Philadelphia, Pa., for Girard Trust Bank and Morgan Guaranty Trust Co.

Fox, Rothschild, O'Brien & Frankel, by Nochem S. Winnet, Philadelphia, Pa., for First National City Bank of New York.

Drinker, Biddle & Reath, by Jack B. Justice, Philadelphia, Pa., for Girard Trust Bank, Chase Manhattan Bank and Brown Brothers Harriman & Co.

White & Case, by Robert L. Clare, III, New York City, for Bankers Trust Co.

Keley, Drye, Warren, Clark, Carr & Ellis, by Edward Roberts, III, New York City, for Manufacturers Hanover Trust Co.

Liebman & Leader, by Bennett Leader, Buffalo, N. Y., for P.D.C. Building Corp.

Sage, Gray, Todd & Sims, by Herschel E. Sparks, Jr., New York City, for New York State Urban Development Corp.

Schnader, Harrison, Segal & Lewis, by Edward Mullinix, Philadelphia, Pa., for Federal Sign & Signal Corp.

## MEMORANDUM AND ORDER

FULLAM, District Judge.

The Debtor is the corporate successor to the New York Central Railroad which, in turn, was the corporate successor of, *inter alia*, the Mohawk and Malone Railway Company. The petitioner, Irving Trust Company, is the successor indenture trustee of the first mortgage of the Mohawk and Malone Railway Company, dated July 1, 1892, securing an issue of $2,500,000 4% Gold Bonds due September 1, 1991. The petitioner seeks to impress a constructive trust, or impose an equitable lien, upon certain of the former Mohawk and Malone assets.[1]

Under the provisions of the first mortgage, "any lands which, in the judgment of the said railway company, it has become expedient to disuse for the purposes of the road" may be sold, with the consent of the indenture trustee, and the proceeds paid over to the railway company "for the express purpose of investing the said proceeds in other lands, which new lands, when acquired by the said railway company, shall likewise be covered by, and subject to, the lien of this mortgage."

With respect to property other than "lands," the mortgage provides:

"And it is further agreed between the parties hereto that until default as aforesaid the said railway company may sell, exchange or otherwise dispose of such materials, rolling stock and other property as may have become old, worn out, disused or undesirable, or are not needed for the purposes of the road, renewing the same or substituting therefore other property of equal or greater value, the said new materials or property thus substituted being covered by and subject to this mortgage."

In practice, transactions involving the disposal of assets of the Mohawk and Malone were handled, over the years, as follows: In the case of real estate, the proceeds of the sales would be deposited with the indenture trustee in a "release of property account." From time to time, these funds would be paid over to the railroad, in exchange for either (a) certification that additions and betterments to property remaining subject to the lien had been made in the amount of such payments; or (b) deposit by the railroad with the indenture trustee, as substitute collateral, Gold Bonds, the cost of which to the railroad had been equal to or in excess of the amount of such payments.

In the case of property other than real estate, the practice was for the railroad

---

1. Morgan Guaranty Trust Company of New York is successor trustee under a second Mohawk and Malone Railway Company mortgage, dated March 1, 1902, in the present amount of $3,900,000. Morgan Guaranty supports the position of Irving Trust Company, but adds the request that, if relief is granted to the Irving Trust Company, provision be made to recognize the second lien of Morgan Guaranty.

to dispose of such property, free and clear of the lien of the mortgage (either by sale or by salvage and reuse) and thereafter to deposit with the indenture trustee, as substitute collateral, Gold Bonds, at the railroad's cost.

In about the year 1961, pursuant to certain abandonment proceedings, the New York Central totally dismantled the Adirondack branch, formerly the property of the Mohawk and Malone Railway Company and subject to the first mortgage. The railroad salvaged and reused, or sold for scrap, materials having a total value of $511,044.82. The cost of dismantling and disposal was $132,674.16, leaving a net amount realized by the railroad in the sum of $378,370.66. Thereafter, New York Central merged into and became part of the Debtor. It was not until early in 1970, upon checking the records, that the Debtor discovered that no accounting had ever been made to the first mortgage trustee for the Adirondack branch salvage.

Under date of March 5, 1970, the Debtor sent the indenture trustee an accounting of this salvage transaction, together with Gold Bonds in the face amount of $379,000, for deposit as collateral. The only difference between this deposit and those which had preceded it on other occasions was that, instead of depositing bonds which had cost the railroad the sum to be accounted for the Debtor on this occasion deposited bonds having a face amount equal to the sum to be accounted for. The cost to the Debtor of these bonds was $251,776.22; as of March 5, 1970, the bonds had a market value of $168,655.

Except for acknowledging receipt of the accounting and of the bonds, the indenture trustee took no further action until June 22, 1970, the day after the Debtor filed its reorganization petition, when the indenture trustee wrote to the Debtor as follows:

"* * * We have reviewed this matter with our counsel and they have advised that in their opinion cash in an amount equal to the fair market value of the salvaged property should be deposited with Irving Trust Company as trustee under the above captioned indenture.

"Irving Trust Company, as trustee, has, in the past, invested monies so deposited in Mohawk and Malone bonds at the cost thereof to your company. Under present circumstances we do not feel that the purchase of Mohawk and Malone bonds would be in the best interests of the bondholders, hence we are unable to follow the procedure you have suggested.

"We would appreciate your arranging for the necessary remittance for deposit in the release of property account at your earliest convenience."

This was followed, on September 21, 1970, by a letter from counsel for the indenture trustee, stating, *inter alia*:

"* * * The past practice with respect to the submission of bonds in lieu of cash, which you may recall, was directly related to the market value of the bonds, is not acceptable to the trustee with respect to the property described in your letter of March 5, 1970. Bonds have never been accepted by the trustee at face value, and the procedure for acceptance of bonds at market value was founded upon the real market value of the bonds. In view of the reorganization proceedings, and the apparent default of the bonds, Irving Trust Company cannot accept bonds as the substitute for property securing the payment of the bonds. * * *"

At no time has the petitioner offered to return the bonds it received on March 5, 1970.

Petitioner contends that it is entitled to receive either immediate cash payment, or a lien on other assets of the Debtor, in the amount of its claim arising out of the circumstances outlined above. The amount of petitioner's claim may be expressed in various alternative ways: The full amount of the Adirondack branch salvage, $511,044.82 (on the theory that the deductions from that amount have not been established of record); the net amount of the Adirondack branch salvage, $378,370.66; the

difference between one or the other of these two figures and either (a) the March 5, 1970 market value of the Gold Bonds, $168,655; or (b) the Debtor's cost of these Bonds, $251,776.22. Thus, the petitioner's claim may be calculated as either $511,044.82; $378,370.66; $210,715.66; or $126,594.44. I shall deal first, briefly, with the question of determining the amount of petitioner's claim, and then discuss the status thereof.

## I.

It is important to note that the proceeds of sales, whether of real estate or personal property, and whether cash or bonds, were never treated as payments on account of the mortgage debt, but simply as deposits of collateral security, to replace the amount by which the original mortgage security had been reduced. Petitioner's "claim" is not for payment as such, but for the deposit of additional collateral.

Petitioner's contention that the correct amount to be accounted for by reason of the Adirondack branch transaction is $511,044.82, is clearly without merit. In the accounting which was supplied on March 5, 1970, expense deductions were claimed which reduced this sum to $378,370.66. Neither then, or at any time until the hearing of the present petition, did the petitioner question the accuracy or validity of these deductions. The testimony at the hearing was to the effect that these deductions were supported by the accounting records of the Debtor, and the petitioner does not suggest that there is any evidence to the contrary. Accordingly, for purposes of the present proceeding, the amount to be accounted for will be deemed to be $378,370.66.

In view of the practice followed on previous occasions, there is likewise no merit in petitioner's contention that the entire amount to be accounted for should be deposited in cash, rather than in Gold Bonds.

While it would seem, from the language of the mortgage indenture, that the market value of the Bonds on the date of deposit would be the relevant consideration, the parties were free to adopt their own interpretation of "equal or greater value" as used in the indenture. Under the circumstances, it would seem that these parties should have been uniquely qualified to judge the correct value to be assigned to the Gold Bonds which were deposited. It is clear that, on each previous occasion when Gold Bonds were deposited as substitute collateral, they were valued at the actual cost to the railroad; in some cases, this cost may have closely approximated the market at the time, but the correspondence makes it clear that the cost figures were used.

It is a fair inference from the record that the parties were not overly concerned with the market price of the Bonds at any given time. Since New York Central and, later, the Debtor, had assumed the obligation of the Bonds of the Mohawk and Malone, and since everyone apparently assumed that the railroad would be good for the money, the parties apparently regarded the deposit of collateral as more or less a formality. It would be difficult otherwise to explain the failure of all parties to take any steps to restore the security until nearly nine years after one of the principal segments of the Mohawk and Malone Railroad had been dismantled and dispersed.

It therefore appears that the maximum amount by which it can properly be claimed that the security of the mortgage has been diminished without the consent of the indenture trustee, by reason of the Adirondack branch transaction, would be $126,594.44, the difference between the proceeds of the dismantling and the cost of the Bonds deposited on March 5, 1970.

## II.

Assuming, for present purposes, that the record establishes a wrongful diminution of the security value of the petitioner's mortgage, to the extent of $126,594.44, the next question is whether the petitioner is entitled to any relief

at the present time. Obviously, the impairment of security does not necessarily mean loss to the bondholders. The total amount due on the mortgage, and the extent and adequacy of its lien, are matters to be determined in the proofs of claim program, and ultimately incorporated in any plan of reorganization which may eventuate from these proceedings. If, as petitioner apparently anticipates, the remaining assets subject to the Mohawk and Malone mortgage are of considerably less value than the aggregate amount of first mortgage bonds outstanding, it would seem that the petitioner would have reason to press a claim against the Debtor's estate for waste; but the amount of this claim and the priority to be assigned to it are proper subjects for disposition in connection with adoption of a plan of reorganization. The only issue raised by the present petition which can now be determined is whether the petitioner still has a lien on the material which was salvaged from the Adirondack branch, or some other, less specific, kind of lien upon the assets of the Debtor.

The petitioner characterizes its present request for relief as being "in the nature of a reclamation petition," on a constructive trust theory. Alternatively, the petition seeks the declaration of an equitable lien. Under either characterization, an essential requisite is an identifiable *res*: In re Dier, 296 F. 816, 819 (3d Cir.), cert. denied, 265 U.S. 584, 44 S.Ct. 459, 68 L.Ed. 1191 (1924); 3 Collier Bankruptcy, ¶60.37 at pp. 932–33, n. 59 (14th ed. 1971); Restatement of Restitution, § 160, comment i, § 161, comment e. The intermingling of these assets with the general assets of the Debtor (which incidentally, was clearly permitted under the mortgage) prevents the imposition of a trust relationship with respect to either the assets or their proceeds. Central States Corp. v. Luther, 215 F.2d 38 (10th Cir. 1954); 4A Collier Bankruptcy, ¶70.25(2), 70.62; Restatement of Restitution, § 215. *See also* the opinion of this Court in support of Order No. 265

in these proceedings (Greyhound Lines, Inc. reclamation petition).

On the present record, the location, identity, ownership, and even existence, of the material salvaged from the Adirondack branch are matters of conjecture. It may be assumed that most of this material found its way into other parts of the Debtor's rail system, but no attempt has apparently been made to trace them; whether there are still available records which would make such tracing possible after this lapse of time may be doubted. Assuming these assets are traceable, they would presumably be subject to other liens, in any event. The petition will be denied.